WESTERN MARYLAND RAILWAY COMPANY

*v.*

THE BOARD OF PUBLIC WORKS OF
THE STATE OF WEST VIRGINIA

(No. 10757)

Submitted September 20, 1955. Decided December 10, 1955.

414

*John G. Fox*, Attorney General, *Robert E. Magnuson*, Assistant Attorney General, *John R. Murphy*, Attorney, State Tax Commissioner's Office, for plaintiff in error.

*Eugene S. Williams*, Baltimore, Md., *James H. Swadley, Jr.*, for defendant in error.

GIVEN, JUDGE:

The Board of Public Works of the State of West Virginia, as required by statute, for the year 1954 assessed an *ad valorem* tax against the Western Maryland Railway Company, an interstate utility, based on the proportional value of the property of the company situated in West Virginia, as found and determined by the board. The taxpayer appealed the assessment to the Circuit Court of Mineral County and that Court, after extensive hearings, substantially reduced the assessment value of the property of the taxpayer upon which the assessment was made. A review of the order of the circuit court rendering the judgment in the matter was granted to the Board of Public Works of the State of West Virginia.

For clarity and brevity the Board of Public Works of the State of West Virginia will usually be referred to as "board"; the Western Maryland Railway Company as "company"; the value of the entire property of the company, wherever situated, without regard to state boundary lines, as "system value"; and the proportional part

of the system value situated and taxable in the State of West Virginia as "state value".

Article 6 of Chapter 11 of the Code, as amended, contains the pertinent provisions relating to the valuation, for taxation purposes, of properties of railroad companies owned or operated in this State, in whole or in part. Section 1 requires that the owner or operator of every railroad, on or before the first day of April of each year, on a form prescribed by the board, shall make a return in writing to the board; that such a return shall be delivered to the State Tax Commissioner, and that such a return shall cover the year ending on the thirty-first day of December next preceding the year for which the tax is to be assessed. The statute requires that such a return be sworn to. Section 2 of that article requires that such returns of railroads shall show: The whole number of miles of railroad owned, leased or operated within this State, and, if an interstate railroad, the number of miles within and the number of miles without the State, including all branches; also, the number of miles of road in each county, and "the true and actual value per mile of such railroad in each county, stating the valuation of main track, second main track, branches, sidings, switches and turnouts separately"; the amount of all rolling stock owned, leased or operated; a detailed statement of the "number and ownership of engines, car lines and cars, including passenger, mail, express, baggage, freight, sleeping, dining, parlor, refrigerator, stock and other cars of every description * * * the true and actual value of all such cars used wholly or in part in this State, distinguishing between those used wholly in this State and those used partly within and partly without the State"; all depots, station houses, section houses, freight houses, machine and repair shops and machinery therein, and all other buildings or structures; and real estate not otherwise taxed, and personal property of every kind whatsoever, "and the true and actual value thereof in each county in this State"; the capital actually employed, the bonded indebtedness, and the indebtedness not bond-

ed, gross earnings in and out of the State, separating the earnings from freight and passengers carried, and the proportion of such earnings in this State; and gross expenditures for the year, giving a detailed statement thereof under each class or head of expenditures. Other pertinent information is also required by the statute.

Section 9 of the same article requires that the tax commissioner, after receiving such returns, "shall arrange, collate and tabulate such returns and all pertinent information and data contained therein, such further evidence or information as may be required by the tax commissioner of such owner or operator, and all other pertinent evidence, information and data he has been able to procure, upon suitable work sheets, so that they may be conveniently considered, and shall on or before the fifteenth day of May, lay such returns and work sheets, together with his recommendations in the form of a tentative assessment * * * before the board of public works." Section 11 of the same article requires that the board shall proceed, not later than the first day of June, "to assess and fix the true and actual value of all property of such owner or operator * * * In ascertaining such value the board shall consider the return, if any, made by the owner or operator, and any return which may have been previously made by such owner or operator, the work sheets and tentative assessment recommended by the tax commissioner, such evidence or information as may be offered by such owner or operator, such further evidence or information as may be required by the board of such owner or operator, and any other pertinent evidence, information and data * * *".

Pursuant to these statutory provisions, the company filed its return with the tax commissioner for the taxable year here involved, showing the state value of its tangible property, exclusive of cash, to be not in excess of $10,797,499.00; the tax commissioner recommended that the state assessment value be fixed at $14,700,000.00; and the board fixed the assessable state value at $11,250,-

000.00. On the appeal to the Circuit Court of Mineral County, the assessable state value was reduced to $8,600,-000.00, or $2,197,499.00, or 20.35 per cent, less than the value fixed by the company in its return.

In determining the assessable value of the property of an interstate utility, the general method followed is to first determine the system value, and then determine the proportion of the system value which should be allocated to the taxing state, as will appear from the authorities hereinafter cited. In determining the system value in the instant case, the board determined, from the return of the company, that the system net railway operating income, five year average, 1949-1953, was $7,982,382.00. That sum, when capitalized at six per cent, indicates the system capitalized earnings value of $133,039,700.00. The net market value, of all states, of stocks and debt, relating only to operated railway property, five year average, 1949-1953, was determined to be $84,542,756.00. The total of the last two sums, when divided by two, gives a system value of $108,-791,228.00. There appears to be no substantial controversy as to the method used by the board in determining the system value. It appears to be the method in general, if not universal, use in determining system value in such cases. Since that value was determined by the board and accepted as the correct system value by the circuit court and appears to this Court to be correct, we hold it to be the true and actual system value for the taxable year involved.

The real difficulty, perhaps not possible of exact solution, arises, and the basis of the controversial contentions appears, when we attempt to determine what proportion of the system value is properly assessable in West Virginia. The tax commissioner, for the purpose of determining tentatively the state value, used what is referred to as a composite allocation formula. He first determined the per cent of the system value located in West Virginia, as shown by original costs thereof, to be 23.06 per cent of

418

the system value. He then determined the per cent of car miles plus locomotive miles made in West Virginia, five year average, 1949-1953, to be 24.37 per cent of all car and locomotive miles made by the system. Traffic units, consisting of ton miles, plus passenger miles, five year average, 1949-1953, in West Virginia, were found to be 14.71 per cent of the system units. The gross operating revenue received for services performed exclusively in West Virginia, five year average, 1949-1953, was found to be 11.23 per cent of such revenues for the entire system. There apparently is no question as to the correctness of any of the percentages of such factors; the first factor is denominated a "property" factor, while the other three factors are denominated "use" factors. The total of the four percentages, as so determined, divided by four, gives an average of 18.34 per cent as the proportion of the system value to be allocated to and assessable in West Virginia; 18.34 per cent of $108,791,228.00, the system value, being $19,952,311.00, or the proportion of the system value assessable in West Virginia, and sometimes referred to herein as the formula value. That amount was, however, reduced by the tax commissioner, in his recommendation to the board, to $14,700,000.00, and a further reduction was made by the board to $11,-250,000.00. The assessment value, as fixed by the board, is 10.34 per cent of the system value. The complaint of the company is that the composite allocation formula fails to use or include certain factors, such as a net income factor, made necessary in the instant case, for the reason that the actual value of the company property located in West Virginia is not comparable to the system property outside of West Virginia; that is, the formula includes in the state value a greater per cent of the system value than the value of that part of the system actually located in or taxable in West Virginia. The circuit court, after fixing the system value at the amount determined by the board, used practically the same composite allocation formula as used by the board, except that a net income factor was considered and the sum of $45,916,572.00 was

deducted from the system value of $108,791,228.00, as excess out of state value, as contended for by the company, before applying the percentage average of the composite allocation formula of 18.34 per cent. The amount of the state value, as found by the circuit court, was $11,531,212.00, a sum greater than the state value fixed by the board. The circuit court, however, reduced the sum so found by it to $8,600,000.00, as the state assessment value, for the purpose, as stated by the court, "To equalize the assessment with that of other railroad properties", and to compensate for the absence from the composite allocation formula tentatively used by the State Tax Commissioner of a net income factor. The amount of the assessment, as so arrived at by the court, is approximately 7.9 per cent of the system value.

As has already become apparent, the controlling issue relates to the methods used by the tax commissioner and the board to eliminate from the state value the so called excess out of state value. The board contends that the composite allocation formula used by it automatically eliminated any such excess value, that being one of the reasons for using the formula, and that the deduction of the excess out of state value, before application of the formula percentage, amounts to a double deduction of such excess out of state value. Of course, if the composite allocation formula actually eliminates, to any extent, out of state value, to that extent the further deduction of the full out of state value would amount to a double deduction. The company contends that such out of state value is not less than $45,916,572.00, and that such amount should be deducted from the system value before the application of the formula percentage value.

There is no doubt that, mile for mile, the property of the company located outside of the State of West Virginia is very much greater than the property of the company located within the State. The company operates in the States of West Virginia, Pennsylvania and Maryland. The main track, 253 miles, of the railway extends from Con-

nellsville, Pennsylvania to Baltimore, Maryland. Approximately eleven miles of this main track are within West Virginia. Several branch lines extend from the main line to points in Pennsylvania and Maryland and other branch lines extend into West Virginia. The company operates 1,276 miles of railroad, 431 miles thereof being in West Virginia, 845 miles thereof being in other states. The main line and the principal branches outside West Virginia are constructed on excellent grades and curvatures and of more expensive materials than those used on the West Virginia branches. Expensive terminal facilities are located outside of West Virginia, principally at Baltimore, some of which are owned by the company, some leased by it and some held by wholly owned subsidiaries. The tracks of the West Virginia branch lines are constructed of lighter and cheaper materials, in part, and are partly on extremely steep grades with many sharp curves, though at least fifty per cent of the road in West Virginia is straight. The company contends that the operation of the West Virginia branches is extremely expensive, as compared with the operation of the lines outside West Virginia, and that the company actually suffered a loss in the operation of the West Virginia branches during the taxable year involved. The freight tonnage originating on the West Virginia system increased from 3,885,007 tons in 1952 to 4,552,834 tons in 1953, and the revenue derived from traffic originating in West Virginia increased from $10,560,637.00 in 1952 to $13,040,152.00 in 1953. For the five year average, 1949-1953, 42.08 per cent of all revenue freight originating on the system originated on that part of the system within West Virginia. Net additions to the West Virginia system from 1946 to 1953 amounted to $2,178,662.00. The all system value increased from $83,874,001.00 in 1947 to $108,791,-228.00 in 1953. The original cost of the fixed property in West Virginia, exclusive of land and rolling stock, was $20,334,151.00. Other facts shown by the record will be referred to in discussion of particular questions involved.

In *Rowley* v. *Chicago & Northwestern Railway Co.,*

293 U. S. 102, 79 L. ed. 222, 55 S. Ct. 55, the Court said: "The ascertainment of the value of a railway system is not a matter of arithmetical calculation and is not governed by any fixed and definite rule. Facts of great variety and number, estimates that are exact and those that are approximations, forecasts based on probabilities and contingencies have bearing and properly may be taken into account to guide judgment in determining what is the money equivalent — the actual value — of the property * * *", citing numerous cases.

In *Great Northern Railway Co.* v. *Weeks*, 297 U. S. 135, 80 L. ed. 532, 56 S. Ct. 426, the Court said: "In determining the amount of the assessment the board was not bound by any formula, rule or method, but for guidance to right judgment it was free to consider all pertinent facts, estimates and forecasts and to give to them such weight as reasonably they might be deemed to have. Courts decline to disturb assessments for taxation unless shown clearly to transgress reasonable limits. Overvaluation is not of itself sufficient to warrant injunction against any part of the taxes based on the challenged assessment; mere error of judgment is not enough; there must be something that in legal effect is the equivalent of intention or fradulent purpose to overvalue the property and so to set at naught fundamental principles that safeguard the taxpayer's rights and property. *Rowley* v. *Chicago & N. W. Ry.*, 293 U. S. 102, 109-111. The assessment is presumed to have been rightly made on the basis of actual value. Its validity must be tested upon consideration of the facts established by the evidence and of those of which judicial notice may be taken."

In *Cleveland, Cincinnati, Chicago and St. Louis Railway Company* v. *Backus*, 154 U. S. 439, 38 L ed. 1041, 14 S. Ct. 1122, the Court said: "* * * The true value of a line of railroad is something more than an aggregation of the values of separate parts of it, operated separately. It is the aggregate of those values plus that arising from a connected operation of the whole, and each part of the

road contributes not merely the value arising from its independent operation, but its mileage proportion of that flowing from a continuous and connected operation of the whole. This is no denial of the mathematical proposition that the whole is equal to the sum of all its parts, because there is a value created by and resulting from the combined operation of all its parts as one continuous line. This is something which does not exist, and cannot exist, until the combination is formed * * * Now, when a road runs into two States each State is entitled to consider as within its territorial jurisdiction and subject to the burdens of its taxes what may perhaps not inaccurately be described as the proportionate share of the value flowing from the operation of the entire mileage as a single continuous road. It is not bound to enter upon a disintegration of values and attempt to extract from the total value of the entire property that which would exist if the miles of road within the State were operated separately * * *".

The authorities generally hold, and it is well settled in this State, that in a controversy involving a tax assessment, upon appeal to a court from the assessing body, there exists a presumption of the validity of the assessment and that clear evidence is required to overcome the presumption. In *Nashville, Chattanooga & St. Louis Railway* v. *Browning*, 310 U. S. 362, 84 L. ed. 1254, 60 S. Ct. 968, the Court said: "* * * In a matter where exactness is concededly unobtainable and the feel of judgment so important a factor, we must be on guard lest unwittingly we displace the tax officials' judgment with our own * * *". See *Hudson Motor Car Co.* v. *City of Detroit*, 136 F. 2d 574; *Adams County* v. *Northern Pacific Railway Co.*, 115 F. 2d 768; *Norfolk & W. Ry. Co.* v. *Board of Public Works of West Virginia*, 3 F. Supp. 791.

In *Western Maryland Railway Company* v. *The Board of Public Works*, 124 W. Va. 539, 21 S. E. 2d 683, involving questions relating to a tax assessment against

the taxpayer involved in the instant proceeding, this Court said: "* * * But there is no doubt either in this jurisdiction, or in the country at large, that a reviewing court will not interfere with the conclusions reached by an assessing body, unless the assessment made is clearly illegal or grossly and palpably wrong on the facts. *Norfolk and Western Railway Co.* v. *Board of Public Works, supra;* (124 W. Va. 562, 21 S. E. 2d 143) *West Penn Power Co.* v. *Board of Review,* 112 W. Va. 442, 164 S. E. 862; *Central Realty Co.* v. *Board of Review,* 110 W. Va. 437, 158 S. E. 537; *West Central, etc. Ass'n* v. *Commissioner of Agriculture,* 124 W. Va. 81, 20 S. E. 2d 797 * * *".

In *Norfolk and Western Railway Company* v. *The Board of Public Works,* 124 W. Va. 562, 21 S. E. 2d 143, this Court said: "Coming, then, to the functions properly exercised by the Board of Public Works, its duties in arriving at the assessment value of the properties of public utilities are primarily administrative and necessarily in conformity to the acts of the Legislature under which it operates and from which it receives its powers. An assessing agency is not bound by any systematic formula or theory in reaching its conclusion as to valuation, and it may consider an unlimited number of pertinent contributing factors. *Great Northern Railway Company* v. *Weeks,* 297 U. S. 135, 139, 56 S. Ct. 426, 80 L. Ed. 532. The same rule applies to the apportionment of the proper shares of system value to the taxing units through which the utility operates. *Rowley* v. *Chicago & Northwestern Railway Co.,* 293 U. S. 102, 109, 55 S. Ct. 55, 79 L. Ed. 222. In order for the courts, as such, to reverse or to interfere with the exercise of the taxing power, there must be a clear showing of the arbitrary abuse of that power that amounts to a *mala fides* purpose to disregard the principle of uniformity, or of practical confiscation." In affirming the judgment of the circuit court which affirmed the assessment fixed by the board, the Court further stated in the opinion: "* * * The railway company does *not* show that

the figure arrived at by the Board of Public Works was plainly excessive nor that there was lack of uniformity due to an arbitrary departure from the valuation of taxpayers in like situation. That, in our judgment, is the indispensable preliminary showing that has not been made here * * *".

After careful review of the very large amount of evidence before the circuit court, including a large number of exhibits and tables showing complicated calculations, and in the light of the settled principles of law referred to in the cases cited, we are of the opinion that the company completely failed to produce evidence sufficient to overcome the presumption of validity of the assessment made by the taxing authority. The contention is made that this Court should examine the evidence only for the purpose of determining whether any evidence was offered to support the finding of the circuit court. Of course, if the evidence offered was sufficient to establish the "indispensable preliminary showing" that the figure arrived at by the board was "plainly excessive", or that there was "lack of uniformity due to an arbitrary departure from the valuation of taxpayers in like situations", this Court would be bound by the circuit court's finding. To hold otherwise than indicated, however, would be simply to ignore the existence of such a presumption. We do not understand the language of the case of *Western Maryland Railway Company* v. *The Board of Public Works, supra,* relied on by the company, to mean that the existence of such a presumption may be disregarded by the circuit court or by this Court. Of course, this Court can not hear the matter *de novo*, or substitute itself for the circuit court, but we can not escape the duty of determining whether proper weight was given by the trial court to the presumption of the validity of the assessment, or that the evidence clearly shows that such presumption was rebutted. If proper weight was not accorded such presumption by the circuit court, then an error of law was committed.

As before noticed, the principal objection of the com-

pany to the state value fixed by the board was that by reason of the composite allocation formula used by the board, excess out of state value was imported into, or included in, the state value. All agree, of course, that no value existing outside the State should be assessed by this State but, as before pointed out, no method is known whereby an exact division of a system value among several states may be had. Therefore, exactness is not required by the law. Yet the allocation of a portion of a system value to a particular state must have such relation to the facts and circumstances of the case as to indicate a reasonably fair allocation, regardless of the method or formula used. Perhaps a discussion here of the formula used by the tax commissioner, or of any other formula, is useless, except as an aid in determining whether the assessment made by the board is reasonable, for, clearly, the state value arrived at by the board is not the result of any definite composite allocation formula. The formula value, as indicated above, was $19,952,-311.00, while the assessment value was $11,250,000.00, or $8,702,311.00 less than the state value indicated by the formula. But the absence of the use of a formula does not disclose whether the state value, as finally fixed by the board, includes any excess out of state value.

Though the authorities do not permit the fixing of such an assessment by segregating and valuing separately certain parts of the system property, and, clearly, such a method would not reflect the true value of a going business, we think that by examining the evidence relating to certain parts of the West Virginia system property, appearing in large part from the return and other evidence of the company, a reasonably sound conclusion may be reached in the instant case as to whether the state value, as fixed by the board, actually includes any out of state value. The return of the company for the year 1953, required by the statute to be considered by the board in the making of the assessment, shows the value of the rolling stock assigned to the West Virginia system to be $6,732,567.00. There appears to be no con-

troversy as to that value, and it does not appear high, since the witness of the company who testified as to values, stated that seventy-one steam locomotives, each of the value of $50,000.00, were assigned to West Virginia, a total value of $3,550,000.00, or more than one half of all rolling stock value. No doubt the need for the seventy-one locomotives, sixty in active service and eleven in a reserve pool, would indicate to those familiar with the methods of making such assessments a need for a considerable quantity of other rolling stock, after proper consideration of such matters as steep grades and sharp curves. It may be noticed that the rolling stock value alone is 59.85 per cent of the assessment value fixed by the board, and 78.29 per cent of the value arrived at by the circuit court. The value of the steam locomotives alone is 41.29 per cent of the value arrived at by the circuit court.

As before pointed out, the assessment or state value, as fixed by the board, was $11,250,000.00, or 10.34 per cent of the system value. The company's exhibit No. 24, showing the reclaim or "junk" value of the "Western Maryland Railway Company's property in West Virginia, excluding the Fairmont branches, as of December 31, 1953", shows a "junk" value of $3,215,622.00. Making up that value are: 9,750,000 pounds of bridge structural steel at 1¢ per pound, $97,500.00; 58,800 gross ton steel rails at 1½¢ per pound, $1,764,000.00; track materials, 23,200 net tons, 1½¢ per pound, $696,000.00; station and office buildings, $49,500.00; water stations, $2,800.00; fuel stations, $3,000.00; engine houses, $19,200.00; shop machinery, $40,000.00; and present value of land, $543,-622.00. It will be noticed that the items constituting the "junk" value do not contain any rolling stock, and apparently contain no ties for the 431 miles of railway track in West Virginia. Apparently, the eleven miles of main line track within West Virginia, in so far as the classes of items listed in the exhibit are concerned, are included in the "junk" value, notwithstanding such portion of the main line track, mile for mile, is comparable

with the other portions of the main line track, and is of prime necessity in the operation of the system. The amount of the "junk" value of the items indicated by the exhibit, when added to the value of the rolling stock, as credited to the West Virginia system by the company, namely, $6,732,567.00, gives a sum value of the "junk" listed and the rolling stock of $9,948,189.00, or a value of $1,348,189.00 greater than the amount of the assessment as fixed by the circuit court, notwithstanding the exhibit expressly excludes any value as to the two branches within West Virginia near Fairmont, the "net system revenue" from which, as to traffic originating in West Virginia only, for the year 1953, amounted to $3,147,-166.00, and notwithstanding no "use" or "going concern" value is included in such sum. Clearly, if the value of the two Fairmont branches, the difference in the actual value and the "junk" value of the eleven miles of main track and the "use" or "going concern" value properly allocable to West Virginia, and possibly the value of the ties on the 431 miles of railway track in West Virginia, were added, the state value would greatly exceed the assessment value fixed by the board. That being true, how can it be said that any out of state value is included in the assessment? From what has been said it should not be inferred that we are of the opinion, in the circumstances of this case, that there exists any basis for assessing any part of the West Virginia system property as "junk". The state system, each part thereof, is a part of a going interstate business earning an annual net railway operating income of $7,982,382.00.

The tax return made by the company for the year 1953 discloses that the value of the terminal facilities in West Virginia is $2,723,513.00. That sum, added to the amount of the rolling stock value, $6,732,567.00, gives a value of $9,456,080.00, or $856,080.00 more than the assessment value fixed by the circuit court. To the $9,456,080.00 value there should be added the value of the West Virginia system property not included in terminal value or in rolling stock value, such as rails, ties, tie plates, angle

bars, frogs, switches, bridges, including three steel bridges between five hundred and one thousand feet in length, seven steel bridges between two hundred and five hundred feet in length, fifteen steel bridges between one hundred and two hundred feet in length, twenty-nine steel bridges between fifty and one hundred feet in length, and fourteen wooden trestles between fifty and five hundred feet in length, on the 431 miles of railway track in West Virginia. Again we think it is clearly demonstrated that no out of state value is included in the amount of the assessment made by the board.

Further demonstration of the fairness of the assessment made by the board is indicated, we think, by certain facts shown: For the five year average 1949-1953, 42.08 per cent of all freight originating on the system originated on that part of the system located in West Virginia; 14.70 per cent of all ton miles made on the system were made in West Virginia; 24.33 per cent of all car miles made on the system were made in West Virginia; 25.43 per cent of all locomotive miles made on the system were made in West Virginia; 38.70 per cent of all road miles operated were operated in West Virginia; 34.80 per cent of all track miles operated were operated in West Virginia; 27.84 per cent of all train miles were made in West Virginia; 16.28 per cent of all passenger miles were made in West Virginia; and approximately thirteen million dollars, or approximately 26 per cent of all revenue received by the system, was derived from traffic originating in West Virginia. The sum of such percentages, divided by nine, gives an average of 27.79 per cent; indicating, roughly, at least, that a very substantial part of the business transacted by the system was transacted over the properties in West Virginia. That average may be compared with the assessment value fixed by the board, 10.34 per cent of the system value, or the assessment value of 7.9 per cent of the system value, as fixed by the circuit court.

The company vigorously attacks the composite allocation formula tentatively applied by the tax commissioner

before submitting his recommendation to the board. Since the formula value was reduced by the tax commissioner by 26.32 per cent before the recommendation was submitted, and since the value recommended was further reduced by 23.47 per cent by the board, showing clearly that the formula value was not adopted, we think little more need be said either for or against the formula. It may be noticed, however, that the circuit court, in arriving at the assessment value fixed by it, the assessment value now contended for by the company, adopted the system value found by the board, $108,791,228.00. It then deducted from that value the sum of $45,916,572.00 claimed by the company to be excess out of state value, leaving the balance of $62,874,656.00. It then determined the West Virginia system value to be $11,531,-212.00, by finding 18.34 per cent of such remainder, which may be compared with the assessment value of $11,250,000.00 fixed by the board. It may be noticed also that the 18.34 percentage figure is the same as that arrived at by the application of the composite allocation formula tentatively used by the tax commissioner. Comparing the results of the two methods used, one by the board and one by the circuit court, is it not clear that all excess out of state value was eliminated from the assessment made by the board? It would seem immaterial whether such excess out of state value was eliminated wholly by the application of the formula used, or in part by the formula and in part by the reduction from the formula value of $19,952,311.00 to the assessment value fixed by the board at $11,250,000.00.

The circuit court deducted from the West Virginia system value, as determined by it, the sum of $2,931,212.00, on the theory that such deduction was necessary to compensate for the absence of a net income factor from the composite allocation formula used by the tax commissioner, and for the further purpose of equalizing the company's assessment with the assessments of other railroads. Since we have found that the formula value was not adopted either by the tax commissioner or by

the board, and that no excess out of state value is included in the assessment or state value, as fixed by the board, the question of a net income factor probably becomes immaterial. In considering the value of a net income factor in the instant case, however, it should not be overlooked that the company admits an income, for the year 1953, as to the Marion and Harrison County, West Virginia branches, and as to traffic which originated on those branches only, of $3,147,166.00. Assuming that all property of the company on all other branch lines in West Virginia is of mere "junk" value, would not such net income indicate a West Virginia system value much greater than the assessment value? We think it also significant that the statute, Code, 11-6-2, specifically requires that a tax return made by a railroad pursuant thereto reflect the gross earnings derived from the whole system and the gross earnings derived from the state system, but makes no such specific provision as to net earnings. For the purpose of illustrating the difficulty arising from the use of a net income factor in a composite allocation formula, we quote from a statement of a committee report, 16 National Tax Association Proceedings, at pages 407 and 408: "Strange as it may seem net earnings is perhaps the worst of all measures of apportionment. If net earnings figures were accurate there could be no need of a method of allocation; but the fact is that figures showing net earnings by states are so inexact as to be meaningless. System net earnings are accurate and exact, because they represent what is left after deducting the total system operating expenses from the total system gross earnings; but when attempt is made to ascertain what part of the net was made in each state, the task is hopeless. Many state commissions call for a report of net earnings by states, and in attempted compliance with the demand, railroad accountants have worked out certain formulae for producing the figure; but a great part of system expenses are insusceptible of localization, and the result is that operating expenses allocated to a state do not even approximate the true figure. One state is given much less than her fair share

of the total expense; another is given vastly more than her proper amount. This is now so obvious, and so well recognized that few states pay any attention to net figures by states, either for valuation purposes or as fixing a ratio for apportionment." See also the Thirtieth National Tax Association Proceedings 251, at pages 258, 259, where it is stated: "* * * It is submitted, therefore, that net earnings constitute a wholly improper allocating factor. Most of the state taxing bodies in our territory no longer pay any attention to it." We do not intend to infer, of course, that the statute precludes the use of a net income factor in every case.

Neither is there any justification in the evidence for the reduction of the state system value for the purpose of equalizing the assessment of the taxpayer here involved with the assessments of other railroads operating in West Virginia. The only basis of such deduction, as stated by the circuit court, was as follows: "The Court has calculated and believes the following percentage to be correct that the Board assessed the B. & O. Railroad Company at 71 plus % of the calculated or prima facie value; the C. & O. Rwy. Co. at 68 plus %; the Norfolk & Western Rwy. Co. at 73 plus %; the Virginian Rwy. Co. at 76 plus %." We are of the opinion that the facts recited furnish no basis in fact for an inference that the assessment fixed by the board was not the "actual value" of the state system, or that any equalization deduction was necessary. To reach such a conclusion, the proof should be sufficiently certain to overcome the presumption of validity of the assessment and the further presumption to the effect that every official acting under oath is presumed to have properly performed his duties. There is no basis found in the evidence to warrant a conclusion that the reduction from the formula value of $19,952,311.00 to the assessment value of $11,250,000.00 was not sufficient to equalize the assessment of the company with the assessments of other railroads, assuming that equalization was necessary. Moreover, the only positive testimony found in the record relating to the

point is that of the board's witness Murphy, who had been employed in the tax commissioner's office for fourteen years; was head of the Public Utilities Division of that office for nine years; and was familiar with the assessments involved, as well as other utilities assessments. He testified: "The Board, since I have been there * * * don't attempt to equalize; they assess what they consider to be the true and actual value." In the case of *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association and Others,* 126 W. Va. 506, 30 S. E. 2d 513, the Court held: "3. To entitle a complaining taxpayer to relief under the 'equal and uniform' provision of Section 1, Article X of the Constitution of West Virginia, there must be a clear showing of discrimination against him in the assessment of the same type of property. Such discrimination is not established where the showing is only that other property of a different type is assessed at less than its apparent or face value, through a process of estimation, and in a good faith effort to arrive at the true and actual value thereof."

It is true that the record does not show the specific basis for reductions made by the tax commissioner and the board in the composite allocation formula value and the value recommended by the tax commissioner. The important question, however, is whether the reductions brought the assessment value within limits required by law. If the reductions effected that result, it does not matter whether they were intended to compensate for a supposed insufficiency in the composite allocation formula tentatively used by the tax commissioner, for the equalization of the assessment with other assessments of taxpayers of the same class, or for some other necessary or unnecessary purpose. The burden was on the company to establish unlawfulness of the assessment, not upon the board to sustain it.

As before noticed, the company contends that it suffered a net loss on the West Virginia system, as a whole, for the year 1953. In its exhibits the method is indicated by which the loss is made to appear. The company allo-

cated to the West Virginia system gross operating revenue on the basis of ton miles, while operating expenses were allocated to the West Virginia system on the basis of division main track miles; that is, on the basis of a particular section of the main track, not on the system as a unit. This method resulted in allocating to the West Virginia system only 11 per cent of all operating revenues, but approximately 25 per cent of all operating expenses. The proportional difference is so great as to raise suspicion as to the approximate accuracy of the method used and appears not to be in accord with the applicable statutory provision of Code, 11-6-2, which reads: "* * * gross earnings for the year, including earnings from telegraph lines, which shall be stated separately, on the whole length of road, including the branches thereof, in and out of the State, and also such earnings within the State on way freight and passengers, and the proportion of such earnings in this State on through freight and passengers carried over lines in and out of the State, to be ascertained by the number of miles the same was carried within and the number of miles without the State * * *". The circuit court, in arriving at the actual cash value of the West Virginia system, apparently did not believe the method used properly reflected the true earnings or loss of the West Virginia system for, clearly, it did not allow controlling effect to the figures relating to the same. The court did, however, find that "If a correct net income factor was used in this allocation formula then the results would be about the amount which this court fixed as the true and actual value * * *" and, after allowing such a deduction, still arrived at an actual value greater than the amount of the assessment fixed by the board. It seems clear, especially in view of the other facts in the case, that the circuit court did not err in refusing to allow controlling effect to the figures indicating a net loss. See *Cleveland, Cincinnati, Chicago & St. Louis Railway Co.* v. *Backus, supra.* We may say here, as was said in *Rowley* v. *Chicago & Northwestern Railway Co.,* 293 U. S. 102, 79 L. ed. 222, 55 S. Ct. 55: "There is nothing in this record to suggest any lack of good faith on the

part of the board. Overvaluation resulting from error of judgment will not support a claim of discrimination. There must be something that amounts to an intention, or the equivalent of fradulent purpose, to disregard the fundamental principle of uniformity. *Sunday Lake Iron Co.* v. *Wakefield,* 247 U. S. 350. *Sioux City Bridge Co.* v. *Dakota County,* 260 U. S. 441. *Chicago G. W. Ry. Co.* v. *Kendall,* 266 U.S. 94. *Iowa-Des Moines Bank* v. *Bennett,* 284 U. S. 239, 245. *Cumberland Coal Co.* v. *Board,* 284 U. S. 23, 28 * * * ".

The company contends that since "the facts of record are essentially the same as those presented in" *Western Maryland Railway Co.* v. *The Board of Public Works, supra,* and certain other proceedings involving tax assessments of the company for other years, which did not reach this Court, the board is estopped, and that the principle of *res judicata* should be applied as to the questions raised relating to the methods of the assessment here involved. We think the Court answered the contention in the case of *In Re: United Carbon Company Assessment,* 118 W. Va. 348, 190 S. E. 546, wherein it is held: "2. The judgment of a circuit court rendered in a statutory proceeding brought by a taxpayer for the purpose of testing the validity of an *ad valorem* property tax for one year does not constitute an estoppel to a like inquiry for a subsequent year, except to the extent that it appears that the facts upon which the former judgment rested are the same as those to be litigated in the proceeding for the subsequent year."

Other points argued have not been overlooked. We think they have been sufficiently answered. From what has been said, it necessarily follows that the judgment of the Circuit Court of Mineral County must be reversed, and the case remanded to that court with directions to enter an order affirming the assessment as made by the Board of Public Works of the State of West Virginia.

*Reversed; remanded with directions.*