431 S.E.2d 661

WESTERN POCAHONTAS PROPER-
TIES, LTD., and Littleton Fuel Compa-
ny, Plaintiffs Below, Appellants,

v.

The COUNTY COMMISSION OF WET-
ZEL COUNTY, West Virginia, Sitting
as the Board of Review and Equaliza-
tion, Defendant Below, Appellee.

PUCKETT INVESTMENT CO.,
Plaintiff Below, Appellant,

v.

The COUNTY COMMISSION OF WET-
ZEL COUNTY, West Virginia, Sitting
as the Board of Review and Equaliza-
tion, Defendant Below, Appellee.

Nos. 21148, 21149.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 12, 1993.

Decided March 25, 1993.

Logan Hassig, Snyder & Hassig, New Martinsville, for the appellants.

Robert J. Hannen, Schrader, Byrd, Byrum & Companion, Wheeling, for the appellee.

James. J. Alex, Sp. Asst. Atty. Gen., Charleston, amicus curiae for Tax Com'r of State of West Virginia.

Thomas N. McJunkin, John A. Mairs, Jackson & Kelly, Charleston, amicus curiae for West Virginia Coal Ass'n.

McHUGH, Justice:

In these consolidated cases, Western Pocahontas Properties, Ltd. (hereinafter "Western Pocahontas"), Littleton Fuel Company (hereinafter "Littleton") and Puckett Investment Company (hereinafter "Puckett") seek review of orders of the Circuit Court of Wetzel County which denied their appeals of the county tax assessor's valuation of their coal properties located in Wetzel County, West Virginia. We conclude upon review of this case that the orders of the circuit court should be affirmed.

## I.

### A.

*Western Pocahontas and Littleton*

In January of 1991, the Wetzel County Assessor (hereinafter "assessor") appraised the coal properties owned by Western Pocahontas and Littleton for tax purposes at $100.00 per acre for Green and Magnolia Districts, and $150.00 per acre for the remaining five districts in Wetzel County.[1] Western Pocahontas and Littleton sought review of this assessment before the appellee, the Wetzel County Commission (hereinafter "Commission"), sitting as the board of equalization and review,[2] on the grounds that the assessor had improperly valued the coal properties.

Following a hearing on the matter, the Commission found that the assessor had properly valued Western Pocahontas' and Littleton's coal properties, and denied their applications for review. The circuit court subsequently entered an order denying their appeal, and affirming the Commission's decision.[3] Western Pocahontas and Littleton now seek review of that order before this Court.

### B.

*Puckett*

In June of 1987, Puckett purchased certain coal properties from Atlantic Richfield Company (hereinafter "ARCO"), a Delaware corporation, for $5,000.00 plus a royalty of two and one-half percent of all coal produced from those properties from July 1, 1987 through June 30, 1992. No coal, however, was produced from these properties prior to June 30, 1992.

For the 1988 real estate tax year, the county tax assessor valued Puckett's Ma-

---

1. The tax commissioner represented in his amicus brief that he would have valued all mineable coal reserves in Wetzel County at $175.00 per mineable acre, using a market comparables approach.

2. Although *W.Va.Code*, 11–3–24 [1979] does not specifically refer to the county commission as the board of equalization and review, this Court has referred to it as such in previous cases. *See, e.g., In re Tax Assessment Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691 (1983).

3. Pursuant to *W.Va.Code*, 11–3–25 [1967], any taxpayer who is aggrieved by any assessment may apply for relief in circuit court. If there was an appearance by the owner before the county commission, the circuit court shall determine the appeal from the evidence taken by the county commission. However, if the owner was not given actual notice and did not appear before the county commission, the matter shall be heard *de novo* by the circuit court. *W.Va. Code*, 11–3–25 [1967] further provides that *if* it is determined that the property "has been valued at more than its true and actual value, or illegally classified or assessed, the circuit court shall, by order entered of record, correct the assessment, and fix the property at its true and actual value."

pletown coal at $20.00 per acre and its Pittsburgh coal at $150.00 per acre. Following an application for review of the assessment in February of 1989, the Commission, sitting as the board of equalization and review, ruled that Puckett's Mapletown coal should be valued at $1.70 per acre, and that its Pittsburgh coal should be valued at $6.14 per acre.

The assessor subsequently advised the Commission, in December of 1989, of his intent to increase the assessed value of Puckett's coal properties. Then, in February of 1990, Puckett applied to the Commission, sitting as the board of equalization and review, to review the assessment and to allow Puckett to present evidence as to the fair market value of its coal properties. The Commission denied the application for review, and Puckett appealed the decision to the circuit court. On November 26, 1990, the circuit court reversed the Commission's decision and found that the true and actual value of Puckett's coal in aggregate was $5,000.00.

In January of 1991, the assessor advised Puckett that its coal properties would have an appraised value of $100.00 per acre for Green and Magnolia Districts and that its remaining districts would have an appraised value of $150.00 per acre. Puckett sought review of this assessment before the Commission, sitting as the board of equalization and review. When the Commission denied the application for review on the grounds that the assessor properly valued the coal properties in accordance with state regulations, Puckett appealed to the circuit court. The circuit court affirmed the Commission's decision, and the appellants appealed. This matter is now

before this Court on appeal of those decisions.

## II.

In support of their appeal before this Court, the appellants in these consolidated cases first assert that the circuit court erred in ruling that the assessor properly applied 110 *West Virginia Code State Regulations* § 1–11.4(b)(8) (1988) to the valuation of their coal properties. The appellants maintain that their coal properties should have been categorized as "unmineable" for valuation purposes rather than as "reserves" because they cannot be mined profitably and therefore are not commercially saleable.[4]

### A.

### *Burden of Proof*

As an initial matter, we point out that this case essentially turns on whether the appellants, in challenging the tax assessment of their coal properties, have met their burden of proof. In *In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691 (1983), we reaffirmed that the burden of showing that a tax assessment is erroneous is upon the taxpayer, and proof that the assessment is erroneous must be clear. We explained:

[i]t is obvious that where a taxpayer protests his assessment before a board, he bears the burden of demonstrating by clear and convincing evidence that his assessment is erroneous. Once this is done, it is incumbent upon the taxing authority to place some evidence in the record to show why its assessment is

**4.** The appellants contend that the economic component of the cost of mining the coal must be considered in categorizing the coal property for valuation purposes, and that the assessor, in interpreting the definition of mineable coal under the regulations, failed to consider whether the coal could be sold for more than the cost of mining it. In support of their argument that the coal properties should be categorized as unmineable because the coal cannot be mined profitably, the appellants cite *William C. Atwater & Co. v. Fall River Pocahontas Collieries Co.*, 119 W.Va. 549, 556, 195 S.E. 99, 102 (1937). In that case, this Court rejected the notion that

mineable coal is any coal that can be mined, regardless of costs, preferring instead to define mineable coal as that which " 'could be profitably mined by judicious methods.' " *West Virginia Department of Highways v. Berwind Land Co.*, 167 W.Va. 726, 744, 280 S.E.2d 609, 619 (1981). These cases are distinguishable from the case now before us. *Atwater* defined "mineable coal" in view of the wording of the mining leases involved in the case. *Berwind* involved valuing minerals in place in an eminent domain proceeding. Here, we are concerned with the value of the coal properties for tax assessment purposes.

correct. This, of course, can be done by entering the official appraisal of the State Tax Commissioner as we suggested in *Tug Valley* [*Recovery Center, Inc. v. Mingo County Commission,* 164 W.Va. 94, 261 S.E.2d 165 (1979)*].

172 W.Va. at 61, 303 S.E.2d at 699. We summarized this holding in syllabus point 7 of *In re Tax Assessments Against Pocahontas Land Co.:* "It is a general rule that valuations for taxation purposes fixed by an assessing officer are presumed to be correct. The burden of showing an assessment to be erroneous is, of course, upon the taxpayer, and proof of such fact must be clear." Therefore, the burden in this case was on the appellants to demonstrate by clear and convincing evidence that the tax assessments were erroneous.

## B.

### *Procedure for Tax Assessment*

The tax assessor in this case was required to follow the legislative rules set forth in 110 *W.Va.C.S.R.* § 1–11 (1988) in valuing the coal properties for tax purposes. Under 110 *W.Va.C.S.R.* § 1–11.4(a) (1988), coal property ownership, for valuation purposes, is classified into four categories: (1) active;[5] (2) reserves; (3) unmineable; and (4) mined-out/barren.[6] There is no dispute among the parties that the coal properties at issue cannot be categorized as either active or barren. Therefore, we shall focus our discussion on whether the appellants have shown by clear and convincing evidence that the assessor should have characterized the coal properties as unmineable rather than as reserves.

The term "reserves" is defined under 110 *W.Va.C.S.R.* § 1–11.4(b)(13) (1988) as "those seams of coal, or portions thereof, which are mineable and contain recoverable coals, but are not active mining property." Furthermore, under these rules, the term "mineable coal" is defined under 110 *W.Va. C.S.R.* § 1–11.4(b)(8) (1988) as

"[c]oal which is so situate that it may be mined using generally accepted mining practices and suitable equipment and which is of such quality so as to be commercially saleable (as either mined coal or as a recoverable reserve). Furthermore, unless there is evidence to the contrary, coal seams which are of a thickness less than thirty inches (30″) will not be considered or classified as mineable."

The term "unmineable" is defined at 110 *W.Va.C.S.R.* § 1–11.4(b)(17) (1988) as "[c]oal which is not mineable as defined above."

The assessor was also required under the legislative rules to consider comparable sales in valuing reserves. Specifically, 110 *W.Va.C.S.R.* § 1–11.4(c)(1)(I)(3) (1988) provides:

(A) General.—Reserves shall be valued considering a review of sales reflecting arms-length, willing buyer-willing seller transactions of such properties, and the market conditions in the region within which the property is located. The coal reserve value shall be the product of the reserve acres multiplied by the regional reserve value per acre for the region in which the property is located.

Information is also provided by the tax department to assist the assessor in valuing the coal property for tax purposes. For example, 110 *W.Va.C.S.R.* § 1–11.4(c)(1)(I)(3)(B) (1988) requires, in pertinent part, that

[t]he values per acre for reserves shall be established annually by the Tax Commissioner after review of recorded willing seller-willing buyer arms-length coal property sales that have occurred in the State of West Virginia during the five (5) years prior to the appraisal date, and through inspection of other appropriate information.

---

**5.** 110 *W.Va.C.S.R.* § 1–11.4(b)(2) (1988) states that the term "Active Mining Property … refers to a mineable seam of coal on a parcel involved in a mining operation."

**6.** "Barren" is also defined under 110 *W.Va. C.S.R.* § 1–11.4(b)(4) (1988) as "[f]ee properties, mineral properties and/or those coal properties where the coal rights are owned, and the existence of one or more coal seams has not been established."

Finally, the assessor may also seek the assistance of an experienced mining expert familiar with the coal property to be assessed. This Court recognized the benefit of employing an experienced mining expert to assist the assessor in valuing coal properties in *In re Tax Assessments Against The Southern Land Co.*, 143 W.Va. 152, 164–65, 100 S.E.2d 555, 562 (1957), *disapproved on another point, In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959).

■ We, therefore, shall summarize the procedure to be employed by the assessor, in valuing coal property, in light of the parties' respective burdens of proof. As a general rule, there is a presumption that valuations for taxation purposes fixed by an assessor are correct. Thus, a tax assessment of coal property will be presumed to be correct when the assessor, in assessing the coal property: (1) relies upon the legislative rules prescribing the methods by which property is to be assessed; and (2) uses, as a guide, information furnished by the tax department, such as a list of comparable sales of similar property. The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous.

### C.

#### Evidence

The coal seams at issue in the present case are of a thickness greater than thirty inches. Furthermore, the coal can be mined;[7] however, the appellants contend that it cannot be mined at a profit and they assert, therefore, that it should be characterized as unmineable. The appellants also contend that all comparable sales were not considered by the assessor, and that he failed to consider the transaction involving the sale of the coal properties from ARCO

to Puckett in assessing the true and actual value of the coal properties. Thus, hearings were held before the board of equalization and review to address the issues of whether the profitability of mining the coal should be considered as a factor in characterizing it under the legislative rules, and whether comparable sales were considered in assessing these coal properties.

#### Western Pocahontas and Littleton

The parties stipulated that the testimony of the Wetzel County tax assessor, Ralph Phillips, and the testimony of the assessor's coal appraiser, Wendell Bolden, given at the hearing on Puckett's case and transcribed, would be used in the Western Pocahontas and Littleton case. Thus, the testimony of Mr. Phillips and Mr. Bolden in the Puckett case was incorporated into the record of the Western Pocahontas and Littleton case.

During the hearing before the board of equalization and review, the Wetzel County tax assessor, Ralph Phillips, testified that he relied upon three factors in assessing the appellants' coal properties: (1) the legislative rules for valuing coal; (2) the services of a coal appraiser; and (3) comparable coal sales. In reviewing comparable coal sales, Mr. Phillips testified that he relied on the list compiled by the State Tax Department, and assessed property values based on the property values in the years 1980–82. The tax commissioner's coal survey relied upon by the tax assessor in this case was titled "Natural Resources Sales and Lease Report," and was dated December 18, 1990. The document included a list of sales from September 1976 through March of 1990. After reviewing numerous transactions involving coal rights, the tax commissioner established a reserve rate of $175 per acre for valuation of coal property in Wetzel County.

7. The report prepared by the John T. Boyd Company valuing the coal holdings of Littleton, submitted on behalf of the appellants, states that "[f]uture underground mining of the Littleton reserves will be restricted to continuous miner production equipment due to the high density of gas/oil wells. An efficient longwall mining plan is precluded by the numerous wells." Mr. Lewis, an engineer employed by the John T. Boyd company, testified at the Puckett hearing that if the oil and gas wells were inactive, they could be plugged, and longwall mining could be used. However, additional costs would be incurred to plug the wells.

In assessing the value of the Magnolia and Green Districts at $100 per acre and the remaining districts at $150 per acre, Mr. Phillips testified that the value of the Magnolia and Green District properties was less because the seam of coal on those properties was not as thick. Mr. Phillips acknowledged that he did not take mining conditions into consideration in his assessment of these coal properties.

Wendell H. Bolden, a coal appraiser and mining engineer who assisted Mr. Phillips in assessing the coal properties, testified that he too relied on the State Tax Department's report and looked at comparable sales. Mr. Bolden acknowledged that the list of comparable sales he relied upon was incomplete in that it did not include the sale of coal property from ARCO to Puckett for $00.07 an acre. Mr. Bolden testified that the price paid by Puckett for its coal properties was "ridiculously low" and stated that "[y]ou may as well give it away." Mr. Bolden testified that, in his opinion, the appellants' coal could be mined using generally accepted mining practices and suitable equipment. He also testified that the coal was of such quality so as to be commercially saleable.

Mr. Bolden further testified that the income approach or the royalty method cannot be used in valuing coal reserves. Mr. Bolden testified that he reached his valuations based upon comparable sales and upon an estimate of recoverable coal being worth four cents a ton in place. Mr. Bolden explained the calculation that he used as follows:

I have used a four and a half foot full height [seam], since I think there's about a minimum that you'd want to mine, at 1750 tons per acre foot and a 50 percent recovery. That come[s] out to be 3938 tons of recoverable coal per acre. And just for easy calculation and from my own past experience, I round that out to 4,000 tons. And put a price on it at 4 cents per ton, sort of on the low side of all these other more authoritative people than I am estimates. And that comes out to be $160 per acre value. If you run it up to 10 cents, it shows it would be $400 an acre. So—it's in there some place.[8]

John Mooney, district engineer of Pocahontas Properties, testified that his company does not have any plans to mine this coal and that it has been attempting to lease or sell this coal. On cross-examination, Mr. Mooney acknowledged that his company has not made any projections as to what it would cost to develop the coal in Wetzel County. Mr. Mooney testified that his company had not made any projections "because we are not [coal] operators. We lease property—or attempt to lease it to the operating entities."

Ronald L. Lewis, an engineer for the John T. Boyd Company, appeared as a witness on behalf of the appellants. Mr. Lewis testified that, in assessing the value of the property, he took into consideration the "income potential of the property," "the lack of transportation," and "other comparable sales in the general region."[9] Mr.

8. Mr. Bolden further testified regarding the method he employed in valuing these reserves:

> Q. And as far as the—attempting to use that formula to value the coal in Wetzel County, you used the lower range of that formula, 4 cents a ton?
> A. Yes, and conservatively estimated the number of tons you could recover from an acre.
> Q. And would it be correct for me to assume that the reason that you used the lower rate, the 4 cents per ton, is because you've taken into consideration the coal's location, its quality in terms of ash, sulfur, transportation problems, et cetera?
> A. Yes, sir, that's the reason I use a lower value.

> Q. And even using that lower value, come out to $160 per acre; is that correct?
> A. At 4,000 tons, recoverable tons per acre, I used—it comes out to $160 per acre.

Mr. Bolden testified that if the seam is thicker and more than 50 percent of the coal is recovered, then the value would be greater than $160.

9. Mr. Lewis explained the factors he considered in valuing these coal properties:

> Basically, we examined the Littleton Fuel property. It was our conclusion that the Pittsburgh seam underlain the entire property at a depth of 1650 to 1300 feet. The seam, itself, the main seam varied from five to seven feet in thickness. The estimated reserves were 91.6 million tons in place and 45.8 million tons of recoverable clean coal. And the quality of the coal was washed at 1.5 specific

Lewis testified that, with respect to Littleton and Western Pocahontas,[10] the sale in the region he believed was most comparable was the sale from ARCO to Puckett. Mr. Lewis assigned the nominal value of $1.00 per acre to both the Littleton coal property and the Western Pocahontas coal property.[11] Mr. Lewis testified that the number of gas wells on the property makes the use of "longwall" mining impractical, but that the wells did not preclude the use of the "continuous miner."

### Puckett

The testimony of Mr. Phillips and Mr. Bolden from the Puckett case has been summarized above. In addition to their testimony in the Puckett case, David Bauer, land manager for Puckett, and Mr. Lewis, the appellants' expert, testified.

David L. Bauer, land manager for Puckett, testified that the sale of property to Puckett by ARCO was an arm's length transaction. He stated that there was no common interest or common ownership between the two companies. On cross-examination, Mr. Bauer acknowledged that the two and one-half percent royalty provision in the contract of sale with ARCO had no value because Puckett knew at the time it purchased the property there would be no mining during the five-year period the royalty provision was in effect. Furthermore,

he acknowledged that ARCO paid the 1987 real estate taxes assessed against the property on behalf of Puckett in the amount of approximately $62,500.[12] When asked on cross-examination whether he had ever acquired property where the second half of the tax liability was paid by the seller, Mr. Bauer responded, "[n]o, not that I know of."

Mr. Bauer testified that Puckett has made attempts to sell the property but that price was never discussed with potential buyers. In response to questions from the Commission, Mr. Bauer testified that Puckett performed drilling to determine the value of the methane gas reserves but that the "deliverability was far less than we anticipated." He acknowledged, however, that he thought they would "eventually" continue to explore for more methane gas.

Mr. Lewis also testified with respect to the valuation of the Puckett reserves.[13] Mr. Lewis testified that "probably 45 percent of the total acreage conveyed is too thin to be mined from a technological standpoint used in other Pittsburgh seam mines or has claystone, mudstone type top, which will be prohibitive in mining costs." Mr. Lewis maintained that mining the remaining balance of the reserve, which he would characterize as a "normal Pittsburgh seam," would be prohibitive because

gravity, was seven percent ash, 3.3 percent sulfur.

10. Mr. Lewis testified that he "examined Littleton in more detail than Western Pocahontas, just based on my knowledge of the Puckett reserve and the Littleton and its, basically, intervening pieces, plus overlap."

11. Mr. Lewis testified that, from an "income approach, we felt it had—was zero value."

12. Mr. Bauer responded to the following questions on cross-examination:

Q. Do you know what those taxes were in 1987?
A. I'm going to estimate they were $125,000. I'd have to check to make sure.
Q. Have you—if a date would have been prorated to the date of closing, you would have been paying the second half of those taxes?
A. That's correct.
Q. So that's roughly $62,500; do you agree with that?
A. Yes.

Q. That ARCO paid your tax obligation for the same year; is that correct?
A. Yes.
Q. So rather than paying $5,000 for the property, ARCO paid you roughly $57,000 to take the property off their hand; is that correct?
A. Well, that's one way of looking at it as part of the negotiations for the acquisition.
Q. And you want to call that an arms-length transaction?
A. I absolutely considered it an arms-length transaction at the time. You might even say that it was not an asset of ARCO's, but a liability. And predominantly because of the property taxes.

13. Mr. Lewis testified that the John T. Boyd Company report found that the total recoverable tons of coal in the ARCO/Puckett property was in excess of 200 million tons.

of the costs which would have to be incurred in investing in new mines and in mining using the room-and-pillar method.

Mr. Lewis further testified that "[f]rom an income standpoint," the coal in the Puckett reserve cannot be mined at a profit "today." [14] However, Mr. Lewis acknowledged that Puckett's coal in Wetzel County can be mined using existing technology, and generally accepted mining practices and suitable equipment.

On cross-examination, Mr. Lewis further acknowledged that he did not consider any other sales in arriving at his determination of the value of the reserves. He testified that "[t]he basic thing I based my conclusion on was that the future income potential of the property was a negative number when you take into account the holding costs." When asked on cross-examination whether his approach was strictly from the income approach and the various capitalization of investment dollars, Mr. Lewis responded that he considered two factors: (1) whether there was any foreseeable future from the income potential of the property; and (2) the actual value of the transaction.

### III.

As we have previously recognized, there is a presumption that valuations for taxation purposes fixed by the assessing officer are correct, and the burden is on the taxpayer to demonstrate by clear and convincing evidence that the assessment is erroneous. The circuit court in this case found that the appellants failed to demonstrate by clear and convincing proof that the assessment of their coal properties

does not accurately reflect their true and actual value. Although the appellants adamantly assert that the coal is unmineable because it cannot be mined at a profit, they did not present clear and convincing evidence that this coal cannot be mined using generally accepted mining practices and suitable equipment. Nor did they clearly show that the Pittsburgh coal is not of such quality as to be commercially saleable. Furthermore, there are numerous inconsistencies between the conclusions reached by the assessor's expert, Mr. Bolden, and the appellants' expert, Mr. Lewis, which are apparent from the summary of their testimony above. Mr. Lewis and the Boyd report place significant weight on the transaction between ARCO and Puckett, and consider the purchase price of $00.07 per acre the most reliable comparable sale in valuing the appellants' properties. However, the evidence in the record indicates that the purchase price paid by Puckett for this property was "ridiculously low," and does not reflect a true market sale. In relying on the ARCO/Puckett sale, Mr. Lewis and the Boyd report clearly ignored the information furnished by the state tax department. Moreover, Mr. Lewis appears to rely substantially on an income approach in valuing these coal reserves, which the appellee and the tax department have represented is not the approach used in valuing coal reserves.[15] Finally, as pointed out by the appellee, the Boyd report and Mr. Lewis value the coal properties at a nominal value of $1.00 per acre despite the fact that even unmineable coal is valued at $5.00 per acre under the legislative rules. There-

---

**14.** Mr. Lewis testified that he did not agree with Mr. Bolden that it "didn't make any sense" to use the income approach to valuing coal reserves in Wetzel County.

**15.** The tax commissioner has asked this Court in his amicus brief to clarify the circuit court's order by recognizing that the income approach to valuation is used for assessing the taxes for *producing* natural resource property. The income approach is *not* used for assessing the taxes for non-producing natural resource property, such as the coal properties in this case. The appellants assert that they are not seeking to have the income approach used as a method to value the coal properties in this case.

The income approach is set forth in 110 *W. Va. C.S.R.* § 1–11.9(b)(1)(B) (1988) which provides:
B. Income approach.—A property's present worth is directly related to its ability to produce an income over the life of the property. The selection of an overall capitalization rate will be derived from current available market data by dividing annual net income by the current selling price of comparable properties. The present fair market value of the property shall then be determined by dividing the annual economic rent by the capitalization rate.

fore, based on this evidence, the appellants have not demonstrated by clear and convincing evidence that the tax assessment is erroneous.

### IV.

 This Court has consistently recognized that "there is no doubt either in this jurisdiction, or in the country at large, that a reviewing court will not interfere with the conclusions reached by an assessing body, unless the assessment made is clearly illegal or grossly and palpably wrong on the facts." *Western Maryland Railway Co. v. Board of Public Works,* 141 W.Va. 413, 423, 90 S.E.2d 438, 445 (1955); *Western Maryland Railway Co. v. Board of Public Works,* 124 W.Va. 539, 543, 21 S.E.2d 683, 685 (1942). We first summarized this holding in syllabus point 1 of *West Penn Power Co. v. Board of Review and Equalization,* 112 W.Va. 442, 164 S.E. 862 (1932): "An assessment made by a board of review and equalization and approved by the circuit court will not be reversed when supported by substantial evidence unless plainly wrong." Upon review, we find that the record supports the circuit court's holding in this case. Therefore, we conclude that the order of the circuit court should be affirmed.

Affirmed.