LEONARD FLOYD *v.* CHESAPEAKE & OHIO RAILWAY COMPANY, *et al.*

(No. 7182)

Submitted February 10, 1932.    Decided March 29, 1932.

*Fitzpatrick, Brown & Davis,* and *C. W. Strickling,* for plaintiffs in error.

*Clay S. Crouse* and *J. W. Maxwell.* for defendant in error.

MAXWELL, JUDGE:

This is an action for damages for false arrest and malicious prosecution. The jury exonerated defendant J. T. McDowell, a constable of Raleigh County, but there was returned in favor of the plaintiff, Leonard Floyd, against the defendants, Chesapeake & Ohio Railway Company, C. B. Dye, K. A. Maddy and Ernest Farley, special police officers of the railway company, a verdict for $3,500.00. The said unsuccessful defendants prosecute this writ of error. We shall deal with the case solely under the count charging false arrest, because if the verdict be upheld it must be on that basis, inasmuch as the second count charging malicious prosecution is clearly not sustained by the evidence. ''The gist of an action for malicious prosecution is malicious purpose and want of probable cause, while the gist of an action for false arrest is the illegal detention of a person without lawful process or by an unlawful execution of such process.'' *Vorholt* v. *Vorholt,* 111 W. Va. 196, 160 S. E. 916. The record does not disclose malicious purpose or want of probable cause.

The plaintiff, age 24, was arrested between two and three o'clock of the morning of September 10, 1930, at his father's home in the outskirts of the city of Beckley. A warrant had been issued a few minutes previously by a justice of the peace of Raleigh County on complaint of one Widensoll, who was at the time in custody and who had then admitted that he had stolen from a freight car of the said railway company the goods alleged to have been knowingly received by the plaintiff. The following persons went to the Floyd home in connection with the execution of the warrant: C. B. Dye, K. A. Maddy, Ernest Farley, defendants, special police officers of the railway company, Edwin Moran, chief of police of the city of Beckley, A. Scalise and Howard Gibbs, state policemen, and John G. Beard, station agent for the said company. The plaintiff testified that officers Maddy, Farley, Moran, Scalise and Gibbs entered his room where he was in bed and arrested him. On behalf of the defense it is said that the officers actually making the arrest were Moran, Scalise and Gibbs. Plaintiff testified that after they left the house "Moran got hold of my arm and led me down between a shed and a box car and knocked me down twice"; that two of his teeth were broken; that Dye said to Moran "Don't hit him any more. He won't be able to testify tomorrow." This conduct is denied by all of the officers and the station agent who was accompanying them.

Following the arrest and the beating incident, if the latter in fact occurred, plaintiff was taken to the state police headquarters in the second story of a building in the city of Beckley. There seems to have been several rooms in the headquarters. Plaintiff says that while he was in one of the rooms, handcuffed, alone with defendant McDowell, constable, the latter beat him about the face with an old shoe. This is denied by McDowell. The other officers deny knowledge of such beating. All deny that plaintiff was handcuffed at any time. There is sharp conflict in the testimony as to whether later in the day plaintiff's face showed evidence of injury. He exhibited to the jury a broken tooth and a scar on his lip which he says were caused by the alleged beatings.

It will be noted that the beatings are alleged to have been

inflicted, first, by the chief of police and, second, by the constable. The railroad police are not charged with having taken an active part in either of the beatings; the most that is said is that they stood by and laughed while Moran was striking plaintiff. Are the railroad company and its police officers liable for the misconduct of the city police chief and the constable? They are not, unless the beatings were a result of their procurement or instigation, directly or indirectly. The evidence does not so disclose. Considering that this evidence with reference to the alleged beatings may have had much influence with the jury in reaching its verdict, the question would seem to arise as to whether it was erroneously admitted at the trial. It was objected to by the defendants, and the objections were overruled by the court. But these adverse rulings were not made a ground in support of the motion to set aside the verdict and award a new trial. They were not made the basis of a special bill of exceptions; nor (under the new alternative practice) have they been pointed out and relied on in the briefs of counsel filed in this court. Code 1931, 56-6-37 (last sentence.) In that situation, the point must be deemed waived, and we cannot consider the same as a basis of error. Exception also was taken to testimony of plaintiff, over objection, that Moran, just prior to striking plaintiff, tried to get him to run so that he could shoot him. This exception is pointed out and relied on as ground for reversal. Inasmuch as this alleged conduct of Moran involved no physical violence, we do not feel that we would be warranted in going to the extent of saying that the narration of it by the plaintiff to the jury was so highly prejudicial as to constitute reversible error.

The plaintiff may or may not have been beaten by the chief of police and the constable with the tacit approval of the special officers: we of course do not know. If such conduct took place it was reprehensible. But whether the beating took place or not, there is another phase of the case which is of outstanding seriousness.

From the time the plaintiff was taken to police headquarters between two and three A. M. he was constantly in the custody of the officers until about seven when he was

placed in jail to await a hearing. Between six and seven, just before he was locked up, he was taken by the officers to the home of his kinsman, Ernest Floyd, who was then placed under arrest. The station agent was in company of the officers from the time of plaintiff's arrest in the early hours of the morning until he was placed in jail more than four hours later. Shortly after plaintiff had been placed in jail, the station agent and special officer Dye, accompanied by a stenographer, repaired to the jail to make further effort to obtain a confession from the plaintiff.

On behalf of the defendants against whom the verdict was returned, it is conceded, because of the long detention of plaintiff at police headquarters, that ''the defendants are chargeable with the nominal damages resulting from a technical false arrest, or false imprisonment, under the decided cases in this State.'' But it is urged that the damages are excessive.

We cannot accede to the proposition that there exists here a situation that would warrant only nominal damages. The conduct of the officers in holding the plaintiff in their custody for more than four hours before they placed him in jail to await a hearing before the magistrate was altogether improper. Not only did the officers thus unlawfully detain the plaintiff in their custody for a period of hours, during at least a part of which time efforts were made to have him confess to the crime of which he was charged, but later in the day they concluded that, inasmuch as the goods which had been taken were in interstate commerce, they would prosecute the accused persons under the federal law, so they obtained a warrant from the United States Commissioner at Beckley. This was done without having produced the prisoner before the justice of peace who had issued the warrant under which the arrest had been made. At a hearing before the United States Commissioner late the same day, the plaintiff was discharged.

A warrant commands the officer to whom it is addressed ''forthwith to apprehend the accused and bring him before the justice, to be dealt with according to law.'' Code 1923, chapter 50, section 223, (Code 1931, 50-18-4). ''An officer

arresting a person under a warrant for an offense shall bring such person before, and return such warrant to, a justice of the county in which the warrant issued, unless such person be let to bail as hereinafter mentioned, or it be otherwise provided.'' Code 1923, chapter 156, section 4, (Code 1931, 62-1-4). When officers have made an arrest under a warrant or capias it is their duty to produce the prisoner without undue delay before the official or court that issued the writ. In the meantime, the prisoner may be kept in jail. Vorhees on Arrests, section 204. No law clothes arresting officers with the power of inquisition through duress, though too frequently they assume it. There has grown up in this country such an abuse of authority by arresting officers between the time of arrest and the time of producing the prisoner before a magistrate, commissioner or court for preliminary hearing as to have occasioned extensive consideration of the subject by the National Commission on Law Observance and Enforcement appointed by the President of the United States. See the Committee's Report on ''Lawlessness in Law Enforcement.''

The peace and good order of society depend in no small measure upon the efficiency of the custodians of the law, who not infrequently risk their lives in public service. In their faithful and proper discharge of duty they are to be encouraged and upheld. But their zeal must not outweigh their discretion. That they may interrogate prisoners with reference to matters under investigation may not reasonably be gainsaid (State v. Richards, 101 W. Va. 136, 132 S. E. 375) ; in fact it is ordinarily highly desirable that they do so, but such interrogation must be within proper and reasonable bounds. That the temptation to exceed proper bounds is great and the provocation often acute does not in any sense justify the officers in turning lawless themselves. Such official lawlessness may manifest itself in a multitude of refinements of physical violence, crass and stupid or subtle and acute; or it may be of a purely mental type. The devices are many, but the object is always the same, namely, to force confession of guilt or the disclosure of facts which will lead to other developments. One of the plans often em-

ployed is to detain the prisoner *incommunicado* in jail, or in a place other than a jail or lockup as in this case.

The fact that this entire class of conduct involves flagrant violation of constitutional guaranties does not seem to deter those who see fit to indulge in it. That the employment of so-called "third degree" methods in dealing with suspected criminals are neither expedient nor efficient is demonstrated by the fact that, in England, according to the best information obtainable, such methods among police officers are practically unknown, and it is common knowledge with us that among the British the enforcement of the criminal law is of a high degree of efficiency.

To a suggestion that there is no inherent injustice in obtaining from a criminal a confession through physical or mental suffering far less than he has afflicted on his victim, the obvious reply is that the inevitable destructive and demoralizing effect of such practices upon the administration of the criminal law condemns the conduct as both barbarous and impractical. And then, too, the accused may be wholly innocent. The officers may have the wrong man. Statistics disclose that this has happened frequently. (This very plaintiff was discharged by the commissioner because of insufficient evidence against him.) When an arresting officer arrogates to himself punitive powers, he becomes a lawbreaker and should be dealt with as such. Police inquisition by compulsion cannot be tolerated or condoned if the organic law of the nation and states is to remain paramount. Such conduct is inherently at variance with fundamental American concepts of right and justice.

The defense of "third degree" methods is built on the postulates, first, that they are necessary, and second, that constitutional methods of procedure must yield to practicality. Both propositions are unsound. The unsoundness of the first is demonstrated by the satisfactory results which obtain where such methods are not employed, and the second is refuted by the inherent truth of the homely maxim, "Two wrongs do not make a right."

Much difference may exist in the kinds of unlawful pressure brought to bear upon prisoners; some of it may be much

more revolting than other, but the primary question remains the same, namely, has the prisoner been deprived of his constitutional rights? "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." Const. of West Virginia, Art. III, sec. 10. "Due process" means procedure which follows those "rules and forms, which have been established for the protection of private rights * * *." *Peerce* v. *Kitzmiller*, 19 W. Va. 564. It is such procedure as is within the limits of those fundamental principles of liberty and justice which underlie our civil and political institutions. *Hurtado* v. *California*, 110 U. S: 516; *Ry. Co.* v. *Iowa*, 160 U. S. 380; *In re Kemmler*, 136 U. S. 436. No procedure is just which deprives a man of the opportunity to be heard respecting the justice of the punishment to be inflicted.

The compelling of an arrested person, by physical or mental suffering, to admit participation in crime, is violative of still another constitutional guaranty, both State and Federal: No person, in any criminal case, shall be compelled to be a witness against himself. 5th Amdmt. Const. U. S.; Const. West Virginia, Art. III, sec. 5.

Where are the Palladia of our liberty, if arresting officers, in the secrecy of secluded places, may with impunity apply to prisoners methods of the days of the rack and the wheel? This sort of thing—a relic of the dark ages—is revolting to enlightened, liberty-loving people and cannot be too severely condemned.

In a case such as at bar, where a discharged prisoner claims damages for false arrest on the ground of deprivation of constitutional rights, there is presented basically a question of fact for jury determination, under proper instructions defining those rights. Such instructions were given. The verdict which followed is of substantial amount, but if we were to pronounce it excessive we would have to say that it is so large as to indicate bias, prejudice, partiality, or corruption on the part of the jury. *Morris* v. *Railroad*, 107 W. Va. 181, 147 S. E. 759. This, we cannot say.

In the unlawful detention of the plaintiff at state police headquarters, the defendants Dye, Maddy and Farley must

be deemed participants along with state policemen Scalise and Gibbs, city police chief Moran and station agent Beard. The defendant company's liability is, of course, an incident to the unlawful conduct of its agents.

For these reasons we affirm the judgment.

*Affirmed.*