303 S.E.2d 691

**In re TAX ASSESSMENTS AGAINST POCAHONTAS LAND CO., et al.**

**No. 15409.**

Supreme Court of Appeals of West Virginia.

May 25, 1983.

Norman Googal, Welch, Jane Moran, Williamson, Alice Green, Jacqueline A. Kinnaman, Charleston, for appellants-Scott King, et al.

Lynn C. Johnson and Ernest F. Hays, II, Bluefield, Jackson, Kelly, Holt & O'Farrell, Thomas G. Freeman, II and Thomas N. Chambers, Charleston, for appellee.

Wade T. Watson, Pros. Atty., McDowell County, Welch, for Assessor.

MILLER, Justice:

This case raises certain procedural issues relating to the reassessment of real property by a county commission acting as a board of equalization and review. Among the issues is the question of the right of the appellants who are taxpayers to intervene in the circuit court after the landowners had appealed their assessments to the circuit court and their subsequent right to bring this appeal. Also challenged is the trial court's ruling as to the procedural sufficiency of the hearings before the Board of Equalization and Review [hereinafter Board] including a claim of inadequate notice.

The controversy originated when Scott King and certain other citizens and taxpayers of McDowell County, the appellants, appeared before the Board on February 14, 1980, with a petition and certain documentary evidence, seeking to demonstrate that the Pocahontas Land Company's Class III surface real property was not assessed at the fair market value. The Board denied the petition but announced its intention to reappraise all Class III surface real property at $300 an acre.

The Board subsequently by a registered letter dated February 19, 1980, advised Pocahontas Land and other Class III property owners of its decision to reappraise the Class III surface real property at $300 an acre as of February 28, 1980. Legal notices were published in the local newspaper on February 25 and 27, 1980, regarding the increase in valuation of Class III surface real property.

After receiving a written letter notice of the increased assessment, Pocahontas Land filed a protest with the Board and request-

ed a hearing on February 26, 1980. It was informed that its protest would be heard on February 28, 1980, along with the other taxpayer protests.

On February 28, 1980, hearings were held before the Board and Pocahontas Land's protest was heard shortly before 4:00 p.m. It is conceded by the parties that the hearing was rather chaotic. Two members of the Board were absent during Pocahontas Land's hearing. A court stenographer was present and Pocahontas Land did get some of its evidence on record. Shortly before midnight, the Board adjourned after confirming its previous increase of the appraised values to $300 an acre.

Following the hearing before the Board, Pocahontas Land and several other Class III taxpayers appealed to the circuit court. The appellants sought and were granted intervention. Ultimately, the circuit court concluded that the procedures before the Board were so inadequate as to require vacating the Board's new appraisal figure of $300 an acre and the court directed that the preceding year's figures be used. The appellants appeal this ruling.

I.

THE MOTION TO DISMISS

Pocahontas Land moved to dismiss this appeal based on the premise that the appellants had no standing to intervene at the circuit court level or to bring this appeal. Pocahontas Land asserts that while *Tug Valley Recovery Center, Inc. v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165, 9 A.L.R.4th 413 (1979), permits

intervention before the Board, it is not authority for intervention at the circuit court level.

In *Tug Valley*, we referred to W.Va.Code, 11–3–25 and 18–9A–11,[1] and concluded in Syllabus Point 3 that these statutes provide standing for taxpayers and residents of counties to contest property tax assessments:

"Insofar as W.Va.Code §§ 18–9A–11 and 11–3–25 both relate to the standing of taxpayers and residents to insure full and proper assessment of all the county's land, they are to be read together. Any interested party may compel compliance with the State Tax Commissioner's report through a writ of mandamus, as provided in W.Va.Code § 18–9A–11; persons likewise have standing to contest the assessment of property in their home counties by way of statutory appeal after having appeared before the Board of Equalization and Review. W.Va.Code § 11–3–25."

The thrust of Pocahontas Land's argument is that the appellants did not appear before the Board and, therefore, under W.Va.Code, 11–3–25, they were not entitled to intervene in the circuit court. Furthermore, in connection with the appeal to this Court, Pocahontas Land points to the last sentence of the statute and contends that since the appellants are not "the State or the aggrieved taxpayer,"[2] they have no standing to appeal the circuit court's ruling. We decline to accept either argument.

From a factual standpoint, we believe the appellants did appear and contest Pocahontas Land's valuation before the Board.

---

1. The relevant portions of these statutes are:
 "Any person claiming to be aggrieved by any assessment in any land or personal property book of any county who shall have appeared and contested the valuation or whose assessment has been raised by the county court above the assessment fixed by the assessor, or who contested the classification or taxability of his property may, at any time up to thirty days after the adjournment of the county court, apply for relief to the circuit court of the county in which such books are made out." W.Va.Code, 11–3–25.
 
 \* \* \* \* \* \*
 
 "In the event the county commission shall fail or refuse to make the reallocation of levies as provided for herein, the county board of education, the tax commissioner, the state board, or any other interested party, shall have the right to enforce the same by writ of mandamus in any court of competent jurisdiction." W.Va.Code, 18–9A–11(h).

2. The last sentence of W.Va.Code, 11–3–25, reads: "The State or the aggrieved taxpayer may appeal a question of valuation to the supreme court of appeals, if the assessed value of the property is fifty thousand dollars or more, and either party may appeal a question of classification or taxability."

The written petition filed by the appellants was rejected by the Board but the Board did decide to raise the valuation of all Class III surface real property. Thus, in effect, the appellants prevailed before the Board and it was not until Pocahontas Land brought its appeal in the circuit court that the appellants sought to intervene.

■ The only difference between the facts in this case and those in *Tug Valley* is that in *Tug Valley* the citizen-taxpayer lost before the Board and appealed to the circuit court. In *Tug Valley*, we concluded: "[P]ersons ... have standing to contest the assessment of property in their home counties by way of statutory appeal after having appeared before the Board of Equalization and Review. W.Va.Code, 11-3-25." 164 W.Va. at 103, 261 S.E.2d at 170.[3] In the present case, we believe the appellants prevailed before the Board by causing the Board to increase the Class III valuations. They should be entitled to defend their position in the circuit court, the same as the petitioners in *Tug Valley* who lost before the Board and were able to present their position to the circuit court. The language of W.Va.Code, 11-3-25, is persuasive to this result since it couches the right of appeal to the circuit court in general language of an "applicant" rather than "taxpayer." Under W.Va.Code, 11-3-25, providing in part that "[t]he right of an appeal from any assessment by the county court [county commission], as hereinbefore provided, may be taken either by the applicant or by the State," a taxpayer who challenges the property assessment of an-other may appear or intervene in the circuit court on an appeal of such assessment.

■ Furthermore, we decline to restrict the meaning of the last sentence of W.Va. Code, 11-3-25, to prohibit an appeal to this court by taxpayers such as the appellants who have brought a challenge to other taxpayers' property valuations. Since they have the right to be heard in the circuit court, they have a right to appeal an adverse decision from that court. Again, we note that *Tug Valley* concluded that a taxpayer has standing to challenge the property valuation set for other taxpayers. Thus, a taxpayer making such a challenge and losing in the circuit court is an "aggrieved taxpayer" under the last sentence of W.Va. Code, 11-3-25, and may pursue an appeal to this Court.

## II.

### THE NOTICE

The trial court held that the notice given by the Board was defective for several reasons. First, it concluded that under W.Va.Code, 11-3-24, when the Board decided to make a general increase in valuation "notice shall be given by publication.... [T]he date of the last publication shall be at least five days prior to the increase in valuation."[4] It does not appear to be disputed that the legal notices were published on February 25 and 27. The court found the notices not to be five days in advance of the increase. Second, the court concluded that the publication notice as well as the

---

**3.** *Tug Valley* was not our first excursion into the question of a taxpayer's right to challenge assessments. In *State ex rel. Harris v. MacCorkle,* 146 W.Va. 946, 953, 123 S.E.2d 888, 893 (1962), we said:

"Mandamus is the proper remedy to compel an assessor to assess for taxation omitted property legally liable for taxation. It lies on the relation of a proper public officer or of an individual taxpayer. 84 C.J.S. Taxation § 581-b; *State ex rel. Miller, Auditor v. Buchanan, Assessor,* 24 W.Va. 362; *State ex rel. Farr et al. v. Martin et al.,* 105 W.Va. 600, 143 S.E. 356; *Central Realty Company et al v. Martin, Assessor,* 126 W.Va. 915, 30 S.E.2d 720."

For pertinent law elsewhere, *see generally* Annot., 9 A.L.R. 4th 428 (1981).

**4.** The relevant portion of W.Va.Code, 11-3-24, is:

"When it is desired to increase the entire valuation in any one district by a general increase, notice shall be given by publication thereof as a Class II-0 legal advertisement in compliance with the provisions of article three, chapter fifty-nine of this Code, and the publication area for such publication shall be the county. The date of the last publication shall be at least five days prior to the increase in valuation. When an increase is made, the same valuation shall not again be changed unless notice is again given as heretofore provided."

letters sent by the Board to the Class III surface real property owners indicated that the Board by an order dated February 19, 1980, had reappraised the property at $300 an acre to take effect on February 28, 1980.[5] The court held that W.Va.Code, 11–3–24, required notice in advance of the setting of the increased valuation because the statute states: "[N]o assessment shall be increased without giving the property owner at least five days' notice, in writing ... of the intention to make the increase."

We will address the issue of whether the notice must be sent in advance of setting the increase in assessment first. A reading of W.Va.Code, 11–3–24, reveals that the foregoing language is applicable where a board determines to raise the valuation of individual property.[6] When a Board decides to make a general increase in valuation, then newspaper publication is required. With regard to newspaper publication, W.Va.Code, 11–3–24, provides: "The date of the last publication shall be at least five days prior to the increase in valuation."[7] The obvious purpose of both statutory provisions is to provide the taxpayer with some advance notice of the actual increase in assessment so that he may file a protest with the Board. The fact that a board determines in advance that property valuations will be raised and then sends the notice does not render the procedure invalid so long as the actual increase in the assessment is not made until after the notice period has expired. It is clear from both the written and published notices that the Board had decided as of February 19, 1980, to raise the valuations but the actual date for the increase was not until February 28, 1980. This was more than five days before the mailing notice date.

This situation is somewhat analogous to the equalization board's action in *Gilmore v. Lawrence County*, 246 Ark. 614, 439 S.W.2d 643 (Ark.1969), where the board sent notices prior to August 1 to taxpayers that the valuation of rural property would be raised. Under state law, the board did not convene as an equalization board until August 1 and the taxpayers contended its decision to raise taxes and its subsequent notice were invalid. The court, however, dismissed this contention noting "it is not decision making by an equalization board before August 1st that is prohibited, but the raising or lowering of valuations." 439 S.W.2d at 646. *See also Day Bros. v. Board of Supervisors of Webster County*, 183 Miss. 240, 184 So. 453 (1938).

In the present case, the fact that the Board decided on February 19, 1980, to make a general increase in Class III surface real property values and, therefore, gave notice by mail to the involved taxpayers that such valuations would be effective on February 28, 1980, the last day of the Board's term, does not violate the provisions of W.Va.Code, 11–3–24, as the taxpayer had an opportunity to contest such valuation prior to the time it became final. In other words, the provisions of W.Va. Code, 11–3–24, are met so long as the county commission sitting as a board of equalization and review sends an appropriate notice to the involved taxpayers at least five days in advance of the date when the increase in assessment will take effect.

As previously noted, the trial court also held that the newspaper publications were defective because they appeared on February 25 and 27, 1980, which was not five

---

5. The relevant language of the letter notice, which was similar to the publication notice, is:

"Pursuant to the requirements of Chapter 11, Article 3, Section 24 (11–3–24) of the West Virginia Code of 1931, as amended, by order duly entered of record on February 19, 1980, the Board of Review and Equalization reappraised your surface land at a figure of $300.00 an acre to take effect February 28, 1980.

"As a result of this reappraisement, the assessment on your property will be increased effective February 28, 1980."

6. The applicable portion of W.Va.Code, 11–3–24, is:

"If the court determine that any property or interest is assessed at more or less than its true and actual value, it shall fix it at the true and actual value. But no assessment shall be increased without giving the property owner at least five days' notice, in writing, and signed by the president of the court, of the intention to make the increase."

7. *See* note 4, *supra*.

days prior to the date of the increase in valuation. The appellants contend that the trial court erred in holding that the newspaper publication was required because W.Va.Code, 11–3–24, provides for publication "[w]hen it is desired to increase the entire valuation in any one district by a general increase." They point to the fact that this was a county-wide increase in Class III surface real property and not a magisterial district increase. We do not agree.

■ The obvious meaning of the notice provisions of W.Va.Code, 11–3–24, is to permit newspaper publication where a board decides to make a general increase in property valuations. This is to avoid the necessity of having to mail individual notices to the affected property owners. This result follows from the earlier provision in the statute which deals with notice requirements where a board determines to raise the assessment value of individual property. Thus, we conclude that W.Va.Code, 11–3–24, provides for two types of notice requirements: newspaper publication for general increases affecting a given class of property owners and personal notice for increases involving individual property owners.

With respect to the newspaper publication, we agree with the circuit court that the last publication on February 27 was not "at least five days prior to the increase in valuation," as required by W.Va.Code, 11–3–24. However, we do not agree that this would necessarily render the Board's reappraisal invalid. It is clear from the partial record before us that Pocahontas Land as well as some other Class III taxpayers did receive written notice at least five days before the effective date of the increase in valuation, February 28, 1980. Pocahontas Land along with a number of other Class III property owners subsequently appeared to contest the increased valuations. If written notices were sent to all affected Class III surface real property owners at least five days in advance, there would be adequate compliance with the statutory requirements.

The Arkansas Supreme Court in *Gilmore v. Lawrence County, supra,* concluded that a statutory notice that was defective as to content could be cured by the taxpayer's appearance. Consequently, we also believe that even where a notice is defective as to date or content it may be cured by the taxpayer's appearance before the board. *See generally Williamson v. Payne,* 25 Cal.App.2d 497, 77 P.2d 900 (1938); *People ex rel. Lunn v. Chicago Title & Trust Co.,* 409 Ill. 505, 100 N.E.2d 578 (1951); *Borough of Wanaque v. North Jersey District Water Supply Commission,* 20 N.J.Misc. 232, 26 A.2d 569 (1942); *Bradford County Citizens in Action v. Board of Commissioners of Bradford County,* 64 Pa.Commw. 349, 439 A.2d 1346 (1982).

It must be remembered that property assessment proceedings have historically been treated as not being subject to rigorous due process requirements. In *State v. Sponaugle,* 45 W.Va. 415, 423, 32 S.E. 283, 286 (1898), this court, in discussing the constitutionality of our forfeited land procedure, reviewed a number of United States Supreme Court decisions and concluded:

"Justice Harlan cites *Bell's Gap R. Co. v. Pennsylvania,* 134 U.S., 232, (10 Sup. Ct., 533 [33 L.Ed. 892]), holding that: 'Process of taxation does not require the same kind of notice as in a suit at law, or proceedings to take property under the power of eminent domain. It involves no violation of due process of law, when executed according to customary forms and established usage.' And Justice Harlan added: 'This must be so, else the existence of government might be put in peril by delays attendant upon formal judicial proceedings for collection of taxes.'"

This point was also stated in *Nickey v. Mississippi,* 292 U.S. 393, 396, 54 S.Ct. 743, 744, 78 L.Ed. 1323, 1326 (1933):

"There is no constitutional command that notice of the assessment of a tax, and opportunity to contest it, must be given in advance of the assessment. It is enough that all available defenses may be presented to a competent tribunal be-

fore exaction of the tax and before the command of the state to pay it becomes final and irrevocable. *Wells, Fargo & Co. v. Nevada,* 248 U.S. 165, 63 L.Ed. 190, 39 S.Ct. 62; *Bristol v. Washington County,* 177 U.S. 133, 146, 20 S.Ct. 585 [590, 44 L.Ed. 701, 707]; *McMillen v. Anderson,* 95 U.S. 37, 24 L.Ed. 335; see *American Surety Co. v. Baldwin,* 287 U.S. 156, 168, 53 S.Ct. 98 [102, 77 L.Ed. 231, 239], 86 A.L.R. 298."

This principle can also be found in more recent state cases. *E.g., Northcutt v. Burton,* 127 Colo. 145, 254 P.2d 1013 (1953); *Little Sister Coal Corporation v. Dawson,* 45 Ill.2d 342, 259 N.E.2d 35 (1970); *Frye v. Haas,* 182 Neb. 73, 152 N.W.2d 121 (1967).[8]

 Thus, we believe that as to those landowners who obtained notice by registered mail, including Pocahontas Land, there was adequate notice. Even though W.Va.Code, 11-3-24, provides for newspaper publication where a general increase in property valuations is proposed by the Board, defective newspaper publication can be cured by adequate notice by mail or by the appearance of the affected taxpayer at a protest hearing.

### III.

### THE HEARING

 The circuit court held that the hearing was so inadequate that assessments confirmed by the Board were null and void. We have only a partial record of what occurred at the February 28, 1980 hearings and it primarily relates to the Pocahontas Land case. As earlier indicated, however, it appears that at the time of Pocahontas Land's hearing two of the three members of the Board were absent. One member had several days earlier indicated that he would be unavailable for the February 28 hearings. The second absent member, Commissioner Boyd, was a basketball coach and left around 4:00 p.m. in order to coach a game.[9] It is clear from the record in this case that Pocahontas Land as well as some of the other taxpayers were denied a meaningful hearing before a proper quorum of the Board.

We have recognized in *In re Eastern Associated Coal Corporation,* 157 W.Va. 749, 755–56, 204 S.E.2d 71, 75 (1974), which involved a hearing before a Board of Equalization and Review, that:

"[C]ertainly 'due process' rights under taxing statutes are more restricted than in other areas of the law. *Spitcaufsky v. Hatten,* 353 Mo. 94, 182 S.W.2d 86. Nevertheless, the right to be heard belongs under the same general constitutional umbrella regardless of the procedural law involved. The right to be heard is fundamental to 'due process'. *State ex rel. Staley v. Hereford,* 131 W.Va. 84, 45 S.E.2d 738; *Floyd v. Chesapeake & Ohio Railway Company,* 112 W.Va. 66, 164 S.E. 28; *Walter Butler*

---

**8.** *Frye v. Haas, supra,* contains these applicable syllabus points:

"1. Within the meaning of the due process clause, laws for the levy and collection of general taxes stand upon a different footing than laws for the levy and collection of special assessments or special taxes.

"2. The power to levy a general tax is inherent in the sovereign, is purely legislative in character, and due process does not require that the property subject to the tax or the amount to be levied should be subjected to judicial inquiry.

"3. Tax proceedings are necessarily summary in nature, are not judicial in character, due process does not require notice and an opportunity to be heard at any particular stage of the proceedings, and notice by a statute itself is sufficient.

"4. There is no constitutional command that notice of the assessment or levy of a tax,

and opportunity to contest it, must be given in advance of the assessment or levy. It is enough that all available defenses may be presented to a competent tribunal before exaction of the tax and before the command of the state to pay it becomes final and irrevocable."

**9.** This event is detailed in our earlier case of *Kemp v. Boyd,* 166 W.Va. 471, 275 S.E.2d 297 (1981), where a petition for Commissioner Boyd's removal under W.Va.Code, 6-6-7, was sought with one of the grounds related to his absence from the Board's hearings. We expressed grave concern in that case about the conduct of the Board but concluded that Boyd's absence would not warrant his removal. In that case, we did not have the benefit of the record in this case or the result may have been different.

*Building Company v. Soto*, 142 W.Va. 616, 97 S.E.2d 275."

In *Kemp v. Boyd*, 166 W.Va. at 478, 275 S.E.2d at 303, we have also pointed out that "the mission of assessing county property for taxes is a task requiring foresight, co-operation and detailed labor. The primary responsibility for the execution of this duty is vested by statute in the county assessors and the county commissions." We have stated in *Tug Valley Recovery Center, Inc. v. Mingo County Commission*, 164 W.Va. at 108, 261 S.E.2d at 173, that under W.Va. Code, 18–9A–11, "the State Tax Commissioner is to make an appraisal of all mineral and surface estates in West Virginia, and *that appraisal is to serve as the basis for determining true and actual value for all assessment purposes.*" (Emphasis in original) [10]

█ From the limited record that we have before us, it is apparent that no one was present to support or protect the Board's increase in assessment values. We have in the past followed general rules relating to assessment challenges: "It is a general rule that valuations for taxation purposes fixed by an assessing officer are presumed to be correct," *Bankers Pocahontas Coal Company v. County Court of McDowell County*, 135 W.Va. 174, 179, 62 S.E.2d 801, 804 (1950), and "[t]he burden of showing an assessment to be erroneous is, of course, upon the taxpayer, and proof of such fact must be clear," *In Re: Tax Assessments Against the National Bank of West Virginia at Wheeling and the Mor-* *ris Plan Savings and Loan Company*, 137 W.Va. 673, 687, 73 S.E.2d 655, 664 (1952), *overruled on other grounds, In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959).

█ It is obvious that where a taxpayer protests his assessment before a board, he bears the burden of demonstrating by clear and convincing evidence that his assessment is erroneous. Once this is done, it is incumbent upon the taxing authority to place some evidence in the record to show why its assessment is correct. This, of course, can be done by entering the official appraisement of the State Tax Commissioner as we suggested in *Tug Valley*.

█ As we have indicated in the earlier portion of this opinion, courts do not demand that a hearing before a board be surrounded by extensive due process procedures. The formal rules of evidence are not applicable. The assessor and a board may call upon the services of the county prosecuting attorney to assist them at such hearing as provided for by W.Va.Code, 7–4–1:

"It shall also be the duty of the prosecuting attorney to attend to civil suits in such county in which the State, or any department, commission or board thereof, is interested, and to advise, attend to, bring, prosecute or defend, as the case may be, all matters, actions, suits and proceedings in which such county or any county board of education is interested." [11]

**10.** The relevant language of W.Va.Code, 18–9A–11(f), is:

"As such appraisal of property in a county, under this section, is completed to the extent that a total valuation for each class of property can be determined, such appraisal shall be delivered to the assessor and the county commission, and in each assessment year commencing after such appraisal is so delivered and received, the county assessor and the county commission, sitting as a board of equalization and review, shall use such appraised valuations as a basis for determining the true and actual value for assessment purposes of the several classes of property."

This same language can be found in the earlier counterparts of this statute extending back to its original enactment in Chapter 84 of the 1953 Acts of the Legislature.

**11.** Under the provisions of W.Va.Code, 7–4–3, certain counties may employ additional legal counsel:

"The county court of any county, having a population, according to the last official census, of one hundred thousand or more shall have authority to employ such legal counsel as it may deem necessary for the purpose of advising such county court touching all matters of a civil character and to conduct any litigation of a civil character to which the county is a party. The county court shall also have the authority to fix the compensation of any counsel so employed, and to pay the same out of the county treasury. Any such counsel so employed may be removed at the pleasure of the county court."

Part of the problem that existed in the present case was that the Board did not schedule protest hearings until the final day of its term. Under the provisions of W.Va.Code, 11–3–24, "[t]he county commission shall annually, not later than the first day of February, meet for the purpose of reviewing and equalizing the assessment made by the assessor." [12] This statute also provides that at the first meeting of the board, the assessor and his assistants shall attend "and render every assistance possible." At this meeting the statute goes on to provide that the board:

"[S]hall proceed to examine and review the property books, and shall add on the books the names of persons, the value of personal property and the description and value of real estate liable to assessment which was omitted by the assessor. They shall correct all errors in the names of persons, in the description and valuation of property, and they shall cause to be done whatever else may be necessary to make the valuation comply with the provisions of this chapter."

In *Consolidated Coal Co. v. Krupica*, 163 W.Va. 74, 254 S.E.2d 813, 816 (1979), we discussed this statutory language and concluded: "These are clearly administrative functions which are designed to monitor the accuracy of the assessor's performance. It is apparent that these administrative operations precede the hearing of any objections by taxpayers, and this framework suggests that these operations be carried out in advance of receiving objections."

Several conclusions emerge from the foregoing discussion. First, the county commissioners, acting as a board of equalization and review, may meet before the first day of February of each year. The assessor is required by W.Va.Code, 11–3–19, to "complete his assessment and make up his official copy of the land and personal property books in time to submit the same to the board of equalization and review not later than February first of the assessment year." Obviously, the assessor working in cooperation with the Board can file the books in advance of the February 1 deadline.

Second, as we noted in *Consolidation Coal Company v. Krupica, supra,* the initial meetings of a board with an assessor involve administrative operations in reviewing his property books. This precedes any hearing or objections and these administrative meetings with the assessor are not formal hearing sessions of the board. Consequently, such administrative meetings are not conducted as a part of the twenty-eight day session that is available to hold hearings on taxpayers' protests.

These conclusions are consistent with our ruling in *In re Morgan Hotel Corporation*, 151 W.Va. 357, 151 S.E.2d 676 (1966), where we held that once the Board had completed its statutory session of twenty-eight days and adjourned *sine die*, it could not reconvene to hear a taxpayer's protest. We would however observe that *Morgan Hotel* did not involve the question of whether a board which is in the middle of a hearing on a taxpayer's protest must adjourn because the twenty-eight session days expire.

In other jurisdictions having statutes setting a definite term for tax assessment review boards, courts have held that they do have power to complete hearings that are in progress. *See Universal Consol. Oil Co. v. Byram*, 25 Cal.2d 353, 153 P.2d 746 (1944); *Whiting Finance Co. v. Hopkins*, 199 Cal. 428, 249 P. 853 (1926); *Buswell v. Board of Sup'rs of Alameda County*, 116 Cal. 351, 48 P. 226 (1897); *People ex rel. Ball v. Anderson*, 21 Ill.2d 396, 172 N.E.2d 760 (1961), *appeal dismissed*, 368 U.S. 18, 82 S.Ct. 137, 7 L.Ed.2d 86; *Loewenthal v. People ex rel. Raymond*, 192 Ill. 222, 61 N.E. 462 (1901); *Leggatt v. Paddi-*

12. The material portion of W.Va.Code, 11–3–24, is:

"The county commission shall annually, not later than the first day of February, meet for the purpose of reviewing and equalizing the assessment made by the assessor. It shall not adjourn for longer than three days at a time until this work is completed, and shall not remain in session for a longer period than twenty-eight days and shall not adjourn sine die before the fifteenth day of February."

*son,* 252 Mich. 140, 233 N.W. 198 (1930); *Reynolds Metals Company v. Ellis,* 227 Or. 467, 362 P.2d 705 (1961); *Polk County v. State Board of Equalization,* 484 S.W.2d 49 (Tenn.App.1972); *Graham v. Lasater,* 26 S.W. 472 (Tex.Civ.App.1894); Annot., 105 A.L.R. 624 (1936).

■ We believe that two defects occurred in the hearing before the Board which compels us to uphold the circuit court's finding that the hearing was inadequate and, therefore, void. First, there was an absence of a quorum at least in regard to the Pocahontas Land case. In *Polk County v. State Board of Equalization, supra,* at 57, a lower court's finding that there had not been a quorum of the board present at a taxpayer's protest was sustained and it was stated: "The interested parties are entitled to have the entire quorum of the State Board present and participating in any hearing or deliberation which purports to be the action of the Board itself." Of some analogy is *Abernathy v. Chester County Tax Board of Appeals,* 254 S.C. 225, 174 S.E.2d 771 (1970), a case where after the taxpayer presented his evidence the board adjourned to a private room where it heard, on an *ex parte* basis, evidence from the tax assessor concerning how he had set the values. The court condemned this procedure and held that the evidence given by the tax assessor could not be considered and consequently there was no evidence to sustain the increase in valuation.

The circuit court also found that there was no evidence presented before the Board that would refute Pocahontas Land's claim that the assessment was made in an arbitrary fashion. Pocahontas Land had the assessor testify that the values that he utilized on the land books were those obtained from the State Tax Commissioner's appraisements. The assessor was not aware of the basis on which the Board had determined to make the general increase to $300 an acre. The taxpayer also produced other witnesses to show that the $300 an acre valuation for Class III surface real property was without any economic foundation.[13] We concur in this finding of the circuit court.

For the foregoing reasons, we affirm the decision of the Circuit Court of McDowell County.

Affirmed.

---

**13.** Pocahontas Land also suggests another ground for invalidating the proceedings. It claims that the members of the Board were biased because they derived a pecuniary benefit from property tax assessments since as county commissioners they receive and disburse funds derived from property taxes. We decline to fully address this issue since it was not raised below and is a nonjurisdictional question. *Wells v. Roberts,* 167 W.Va. 580, 280 S.E.2d 266 (1981); *Boury v. Hamm,* 156 W.Va. 44, 190 S.E.2d 13 (1972).

*Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), and *State ex rel. Shrewsbury v. Poteet,* 157 W.Va. 540, 202 S.E.2d 628, 72 A.L.R. 3d 368 (1974), cited by Pocahontas Land are not applicable because the commissioners derive no direct personal pecuniary benefit from the tax revenues as did the mayor in *Ward* and the Justice of the Peace in *Poteet,* who had their salaries supplemented by the fines they imposed. The commissioners' salaries are set by the Legislature. W.Va.Code, 7–1–5a. In *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928), the United States Supreme Court held that where the mayor's salary was set by an ordinance, the fact that the fines he ordered assessed in Mayor's Court went into the town's general treasury did not give rise to an impermissible pecuniary interest which would trigger a due process violation.