443 S.E.2d 595

**RAWL SALES & PROCESSING CO., a Corporation, Petitioner Below, Appellee,**

**v.**

**COUNTY COMMISSION OF MINGO COUNTY, Respondent Below, Appellant.**

**GILBERT IMPORTED HARDWOODS, INC., a Corporation, Petitioner Below, Appellee,**

**v.**

**COUNTY COMMISSION OF MINGO COUNTY, Respondent Below, Appellant.**

**HAMPDEN COAL COMPANY, INC., a Corporation, Petitioner Below, Appellee,**

**v.**

**COUNTY COMMISSION OF MINGO COUNTY, Respondent Below, Appellant.**

**No. 21756.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 1994.

Decided March 28, 1994.

Dissenting Opinion of Justice Neely March 30, 1994.

Jane Moran, Williamson, for appellants.

James J. Alex, Charleston, for State Tax Com'r.

Stephen Stockton, Asst. Atty. Gen., Tax and Revenue Div., Charleston, for State.

Paul E. Pinson, Williamson, for appellees.

BROTHERTON, Chief Justice:

The appellants, the Mingo County Commission and the State Tax Commissioner, ask this Court to reverse a February 19, 1993, order of the Circuit Court of Mingo County in which that court ruled in favor of the appellee taxpayers in their appeal of property tax assessments.

The dispute in this case centers around the 1992 assessments of several natural resources properties. These assessments were made in accordance with a plan for property revaluation set forth in West Virginia Code § 11–1C–1 *et seq.* (1991). The state tax commissioner valued the subject properties pursuant to the legislative directives found in W.Va.Code § 11–1C–10. The assessor applied an assessment rate of 44% of true and actual value, and provided a public notice of percentage increases over last year's assessments, as required by W.Va.Code § 11–3–2a. The following Class II–0 legal advertisement appeared in the Williamson Daily News on January 15, 1992, and January 22, 1992:

LEGAL ADVERTISEMENT

In accordance with the W.Va. Code 11–3–2a the following increases in assessed valuations will be effective for the 1992 Tax Year for real estate:

Class 2 51.61 percent

Class 3 18.23 percent

Class 4 41.09 percent

Taxpayers have the opportunity to review and protest the values placed on the land rolls during the Board of Equalization meetings held in February.

Joey Kohari,
Mingo County Assessor
1:15.22

Through counsel, the appellee taxpayers met with the deputy assessor in February, 1992, to inquire about lowering their assessments. Thereafter, on February 19, 1992, the taxpayers appeared before the Mingo County Commission, sitting as the Board of Equalization and Review. At this time, they protested the final assessments of their Class 3 and 4 properties to the extent that these assessments exceeded the increase set out in the assessor's January legal ads. However, counsel for the taxpayers acknowledged that prior to this February 19, 1992, hearing, they had already received actual notice of the final assessment reported by the assessor.

The Board of Equalization and Review refused to grant the taxpayers' relief. On March 27, 1992, the taxpayers filed petitions for writs of certiorari and appeal with the Circuit Court of Mingo County, pursuant to W.Va.Code §§ 11–1A–18, 11–1B–14, and 53–3–1. The taxpayers sought review of the Board's denial of their protests, arguing that (1) they had not received adequate notice of the final evaluation and assessment of their properties, and (2) the assessments were erroneous and excessive.

On April 23, 1992, the state tax commissioner filed a motion to dismiss, arguing that the taxpayers failed to file the record from the hearing before the county board with their appeals, as required by W.Va.Code §§ 11–3–25 and 58–3–4. In a subsequent pleading filed pursuant to the circuit court's request for further briefs, the commissioner argued that the taxpayers had used an invalid statutory appeal route, in that they prayed for writs of certiorari based on W.Va.Code §§ 11–1A–18 and 11–1B–14, and that these provisions are not applicable to the current revaluation of property, as the legislature indicated in W.Va.Code § 11–1C–1(b). For this reason, the commissioner maintained

that the circuit court did not possess subject matter jurisdiction.

The county commission intervened in October, 1992, and argued that the assessor's notice was statutorily sufficient, but that if there was any defect, it was waived or cured by the taxpayers' February 19, 1992, appearance before Board of Equalization and Review.

On February 19, 1993, the circuit court ruled for the taxpayers. The lower court sustained the taxpayers' notice argument and ordered relief based on the variance between the increased percentages found in the notice and those which were actually applied to the taxpayers. As a result, Mingo County must either refund or credit to the taxpayers approximately $170,441.02. The appellants now appeal and ask this Court to reverse the February 19, 1993, decision of the Circuit Court of Mingo County. For the reasons discussed below, we set aside the lower court order.

First, the appellants argue that the circuit court erred when it found that certain property was incorrectly assessed based on the assessor's notice that was given pursuant to W.Va.Code § 11-3-24. The appellants contend that the taxpayers appearance before the Mingo County Board of Equalization and Review cured any defect that may have existed in the notice, because the taxpayers had an opportunity to present their arguments to the Board. We agree with the position advanced by the appellants.

"[West Virginia] Code, 11-3-24, provides for two types of notice requirements: newspaper publication for general increases affecting a given class of property owners and personal notice for increases involving individual property owners." Syl. pt. 5, *In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691 (1983). In this instance, the taxpayers concede that the notice itself was proper, but they dispute its content. However, as we noted above, the taxpayers admitted that they were informed of the actual assessments that were applicable to their properties prior to their appearance before the Board. Thus, the taxpayers had ample opportunity to argue against the final assessments before the Board of Equalization and Review. In *In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691, 697 (1983), this Court recognized that a notice that is defective as to either date or content may be cured by the taxpayer's appearance before the board. "Even though W.Va.Code, 11-3-24, provides for newspaper publication where a general increase in property valuations is proposed by the Board, defective newspaper publication can be cured by adequate notice by mail or by the appearance of the affected taxpayer at a protest hearing." Syl. pt. 6, *In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691 (1983). Consequently, we find no prejudicial error with respect to the notice that was published in this instance.

Next, the appellants argue that the taxpayers incorrectly appealed from the board's decision to the circuit court pursuant to W.Va.Code §§ 11-1A-1 and 11-1B-1, rather than by the normal route found in § 11-3-25. The appellants also maintain that the taxpayers failed to comply with mandatory jurisdictional appeal requirements, and that the circuit court should have rejected their appeals for this reason. We agree.

As we initially indicated, the property assessments at issue in this case were made pursuant to a legislative decision to implement an ongoing revaluation of property. This "fair and equitable property valuation" is described in W.Va.Code § 11-1C-1 *et seq.* West Virginia Code § 11-1C-1(a) states that:

> (a) The Legislature hereby finds and declares that all property in this state should be fairly and equitably valued wherever it is situated so that all citizens will be treated fairly and no individual species or class of property will be overvalued or undervalued in relation to all other similar property within each county and throughout the state.

The legislature specifically noted that this property revaluation was not to be confused with earlier attempts at reappraisal. In W.Va.Code § 11-1C-1(b), the legislature explains that:

> (b) The Legislature by this article seeks to create a method to establish and main-

tain fair and equitable values for all property. *The Legislature does not intend by this article to implement the reappraisal as conducted under articles one-a and one-b [§§ 11–1A–1 et seq. and 11–1B–1 et seq.] of this chapter nor does it intend to affect tax revenue in any manner.* (Emphasis added.)

The appeal route taken by the taxpayers in the case now before us—review by writ of certiorari through W.Va.Code §§ 11–1A–18 and 11–1B–14—was an extraordinary appeal process applicable only to the 1983 reappraisal. West Virginia Code § 11–1B–2 states specifically that "[t]he provisions of this article *shall apply only* to the appraisement of property subject to ad valorem taxation ... and *shall not apply* to any appraisement or reappraisement of any such property in any county or counties of this state ... subsequent to the year one thousand nine hundred eighty-seven."

The proper procedures for appeal from a county court [county commission] decision are outlined in W.Va.Code § 58–3–1 *et seq.* The provisions of this article are to be read *in pari materia* with § 11–3–25, which specifically addresses the appeal process for property tax assessments that are made pursuant to the property revaluation set forth in W.Va.Code § 11–1C–1 *et seq.* West Virginia Code § 11–3–25 provides, in pertinent part, that:

> *Any person claiming to be aggrieved by any assessment in any land or personal property book of any county who shall have appeared and contested the valuation or whose assessment has been raised by the county court [county commission] above the assessment fixed by the assessor, or who contested the classification or taxability of his property may, at any time up to thirty days after the adjournment of the county court [county commission],* apply for relief to the circuit court of the county in which such books are made out; but he shall, before any such application is heard, give ten days' notice to the prosecuting attorney of the county, whose duty it shall be to attend to the interests of the State, county and district in the matter, and the prosecuting attorney shall give at least five days' notice of such hearing to the tax commissioner. The right of appeal from any assessment by the county court [county commission], as hereinbefore provided, may be taken either by the applicant or by the State, and in case the applicant, by his agent or attorney, or the State, by its prosecuting attorney or tax commissioner, desires to take an appeal from the decision of the county court [county commission], the party desiring to take such an appeal shall have the evidence taken at the hearing of the application before the county court [county commission]. If there was an appearance by or on behalf of the owner before the county court [county commission], or if actual notice, certified by such court [county commission], was given to the owner, the appeal, when allowed by the court or judge, in vacation, shall be determined from the evidence so certified. (Emphasis added.)

The appellants assert that the taxpayers failed to comply with mandatory jurisdictional requirements because they did not provide the circuit court with a record of the proceedings below within thirty days after the adjournment of the Board of Equalization and Review. In *In re Tax Assessment Against Stonestreet,* 147 W.Va. 719, 131 S.E.2d 52, 56 (1963), this Court recognized that "[t]he statutory provisions which relate to and govern appeals from the County Court [County Commission] to the Circuit Court are mandatory and must be complied with and satisfied." Further, we explained:

> *The provisions of Section 25, Article 3, Chapter 11, Code, 1931, as amended,* governing appeals from the county court to the circuit court of the county from an assessment made by the county court, in which there was a hearing and an appearance by the property owner, and requiring that the application for an appeal be presented in the circuit court within thirty days from the adjournment of the county court by which the order complained of was rendered, *and the provisions of Section 4, Article 3, Chapter 58, Code, 1931,* requiring that the petition be accompanied by the original record of the proceeding in the county court in lieu of a transcript of

such proceeding, *are mandatory and will be read and considered together;* and when it appears upon review in this Court that the petition, though presented within the thirty day period, was not accompanied by the original record of the proceeding in the county court and that no record of such proceeding was filed in the circuit court within the limitation of thirty days prescribed by Section 25 of the statute, the appeal applied for must be refused by the circuit court and the writ of error awarded by this Court to the judgment of the circuit court refusing such appeal will be dismissed.

*Id.* at syllabus (emphasis added).

In this case, a record was not filed until May 20, 1992, exceeding the statutory deadline of March 30, 1992, by fifty-one days. Because the taxpayers did not comply with mandatory statutory jurisdictional requirements, review should have been refused by the lower court.

For the foregoing reasons, the February 19, 1993, order of the Circuit Court of Mingo County is hereby reversed.

Reversed.

NEELY, Justice, dissenting:

Who is kidding whom? The majority's emphasis of form over substance is particularly ironic because the form emphasized, namely the procedure for appealing tax assessments, is probably the least competent of any similar procedure in the entire *Code.* The procedure was established over 30 years ago by this Court by reading *in pari materia* two code sections, *W.Va.Code* 11-3-25 [1967] (appeal to the circuit court must occur "at any time up to thirty days after the adjournment of the county court") and *W.Va.Code* 58-3-4 [1923] (petition "shall be accompanied by the original record of the proceeding in lieu of a transcript thereof"). *See In re Stonestreet,* 147 W.Va. 719, 726, 131 S.E.2d 52, 56 (1963) (the appeal provisions from the county commission to the circuit court are "mandatory and must be complied with and satisfied").[1] Together these appeal requirements substantially bar most appeals to the circuit court of tax assessments made by the county commission!

It is hard enough to get a court reporter to attend and transcribe a first degree murder trial, but a tax hearing is almost impossible unless a person has enough foresight and enough money to summon a competent private reporting service.[2] The majority appears to be unaware of transcript preparation problems, even though in 1993 this Court issued 11 orders to court reporters requiring the production of the several months' overdue transcripts. The problem of transcript production is escalating; in 1988 and 1989 we issued only 1 order each year; in 1990, no orders; in 1991, 3 orders; and in 1992, 9 orders. Given the preparation time that elapses before this Court's involvement, these court reporter order statistics indicate a substantial problem. However, the majority ignores the practical problem of their transcript requirement. But the problem remains. How are you going to get a tax hearing reduced to transcript within 30 days? Even if a mandamus order for a transcript is sought, the majority's 30 day mandatory requirement for a transcript cannot be met.

The bar of an appeal to the circuit court is particularly troublesome because the county commission lacks expertise in property evaluation but is extraordinarily knowledgeable about the government's need for money, an ingrained bias that is particularly harmful to non-voting entities. Although someone should review the assessor's property evaluation, assigning this important review to the

1. *But see Talkington v. Barnhart,* 164 W.Va. 488, 493, 264 S.E.2d 450, 453 (1980) ("Rules 1 and 61 make clear our intent to avoid placing form over substance in the procedures of our courts.... We will not sacrifice an appellant's substantial rights for rules that do not result in prejudice. [Footnotes omitted.]"

2. In this case, the appellees incorrectly sought relief through a writ of certiorari based on *W.Va. Code* 11-1A-18 [1983] and 11-1B-14 [1986]. By order dated March 27, 1992, the circuit court required the county commission "forthwith certify the evidence in the proceeding below and remove and return the record to" the circuit court. Apparently the hearing transcript was finally filed by the appellees on May 20, 1992 or 51 days after the statutory deadline of March 30, 1992.

county commission is perhaps not a scheme whose design would prompt nomination for the Nobel Prize in jurisprudence. Indeed, a hearing before a county commission on a tax appeal is probably best described by the old Jewish expression:

"פון דיין מויל עיר גוזח אויטר."[3]

The lack of a meaningful opportunity for a review of the county commission's decision invests it with extraordinary power—a power, the majority's opinion leaves virtually unchecked.

Before the county commission, the appellees argued that although the assessor had used 1992 assessed values for taxpayer's natural resources properties, 1962 assessed values were used for *all the other property in Mingo County.* The appellees argued that although everyone should be assessed on fair market value by 1994, the early implementation of the 1992 assessed values *uniquely* on their natural resources properties resulted in a disproportionate tax increase. For example, other Class 3 property taxes increased 18.23 percent but Class 3 natural resources property taxes increased between 200 and 400 percent because the assessor used 1992 assessments, rather than 1962 assessments.[4] In Syl. pt. 3, *Matter of U.S. Steel Corp.,* 165 W.Va. 373, 268 S.E.2d 128 (1980), we held that a "taxpayer is entitled to have its taxes computed in the same manner and on the same basis as the favored taxpayers." In *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County, W.Va.,* 488 U.S. 336, 343, 109 S.Ct. 633, 637, 102 L.Ed.2d 688 (1989), the Supreme Court said "the constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners. [Citations omitted.]" The majority uses form arguments to ignore the appellees' constitutional arguments. To echo Chief Justice Brotherton's dissent, in which I joined, in *In re 1975 Tax Assessments Against Oneida Coal Co.,* 178 W.Va. 485, 490, 360 S.E.2d 560, 565 (1987) (Brotherton, J. dissenting), *rev'd, Allegheny Pittsburgh, supra:* "It appears to me that the tail is now wagging the dog in West Virginia property taxation."

Today, as a direct result of the progressive transfer of private family responsibilities to government budgets at enormous net cost increases,[5] governments at all levels are facing near bankruptcy. County commissions, if left unsupervised, are tempted to inaugurate in fact the philosophy instantiated in the proposed revision to federal income tax form 1040 that, so far, is only discussed in theory. Under the proposed new, "simplified" form 1040 there is one question and one instruction, to-wit: (1) How much did you make? (2) Send it!

Perhaps the tax assessment in this case was correct. I don't know. What I do know is that there is a literacy test for circuit judges, which makes them unique among all officials in the total county tax assessment process. To say that the *procedures* in this case were deficient is simply high irony: This case should be decided on the merits even if it requires us to get our hands dirty analyzing a few numbers and reading a little testimony, or remanding the case for further review.

3. "From your mouth to God's ear."

4. The appellees presented their disproportional taxation argument by claiming that the legal notice was insufficient because the advertised increase was 18.23 percent but the increase for natural resources properties was between 200 and 400 percent. The majority's discussion never recognizes the appellees' equal protection and due process arguments.

5. *See* R. Neely, *Tragedies of our Own Making: How Private Choices have Created Public Bankruptcy,* Illinois University Press (Champaign, Ill., 1994).